```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3
                                    )
 4   UNITED STATES OF AMERICA,      )   CR 02-00209 DAE 05
                                    )
 5                  Plaintiff,      )   Honolulu, Hawaii
         vs.                        )   May 30, 2003
 6                                  )   9:45 A.M.
     EDUARDO MINA,                  )
 7                                  )   Defendant's Motion to
                    Defendant.      )   Suppress Statements;
 8                                  )   Defendant's Motion to
     _____)   Suppress Evidence
 9

10               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE DAVID ALAN EZRA
11         CHIEF UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13
     For the Government:      J. MICHAEL SEABRIGHT, ESQ.
14                            CRAIG H. NAKAMURA, ESQ.
                              Office of the U.S. Attorney
15                            PJKK Federal Bldg.
                              300 Ala Moana Blvd., Ste. 6100
16                            Honolulu, HI 96850

17   For the Defendant:       CLIFFORD B. HUNT, ESQ.
                              500 Ala Moana Blvd., Ste. 480
18                            Honolulu, HI 96813

19   Official Court Reporter: Debra Kekuna Chun, RPR, CRR
                              United States District Court
20                            300 Ala Moana Blvd., Ste. C285
                              Honolulu, HI 96850
21                            (808) 534-0667

22

23

24
     Proceedings recorded by machine shorthand, transcript
25   produced with computer-aided transcription (CAT).
```

# EXHIBIT A

1   Q     And where was Agent Campbell?
2   A     Oh, behind her.  About -- they were not side by side
3   really.  They were -- Agent Campbell was behind her, and it
4   was doing like that (indicating).
5   Q     Okay.  But you were on the one side of the table by
6   yourself; is that right?
7   A     Yeah.  And Agent Yamane was on the other side with the
8   tape-recording, is manipulating it.  That's why I know that
9   our interview was taped.  I do not know why they will not
10  bring the tape out.
11  Q     And to your left, by your left hand, that direction is
12  where the door was in the interview room.
13  A     No.  Agent Yamane is there.  I am here.  The
14  (indicating) -- the tape recorder was here, and it was
15  always being manipulated by Agent Yamane.
16  Q     I'm not asking about the tape recorder right now, sir.
17  I'm asking you where was the door to the room in relation
18  to where you were sitting?
19  A     Maybe back left.
20  Q     Behind you to the left?
21  A     Yeah.
22  Q     Okay.  So you're saying it wasn't to your immediate
23  left.
24  A     I said back left.
25  Q     The back left, okay.  And did you have free access to

1   get from where you were to the door?

2   A    What do you mean by "free access"?

3   Q    Let me ask it a different way.  Was there anything

4   blocking you from standing up and walking to the door?

5   Physically, was there anything blocking you?

6   A    Yeah.

7   Q    What was blocking you?

8   A    Yeah, there is no impediment.  Nobody blocks the door.

9   Q    And after Agent Yamane played the tape you told him

10  that you had found Jesus Christ and realized what you had

11  done was wrong; isn't that correct?

12  A    I told him about Jesus immediately because I am a

13  new -- what I would say a new child of God.

14  Q    And you told him you realized what you were doing at

15  the Liquor Commission was wrong; isn't that correct?

16  A    That's correct.

17  Q    And you went on to tell him that you accepted money in

18  return for overlooking violations.

19            MR. HUNT:  Objection.

20            THE WITNESS:  That is his own --

21            MR. HUNT:  Wait, wait, wait.  Objection.  Not

22  relevant to the purposes of these proceedings.

23            THE COURT:  Sustained.

24            MR. HUNT:  Move to strike his response, if it was

25  recorded by the reporter, Your Honor.

```
1              THE COURT:  Granted.
2              MR. SEABRIGHT:  I have nothing further, Your
3    Honor.  Thank you.
4              THE COURT:  Redirect.
5                    REDIRECT EXAMINATION
6    BY MR. HUNT:
7    Q    Mr. Mina, why -- you testified that you thought the
8    interview was taped?
9    A    Again?
10   Q    When you were at the police station with the agents,
11   you testified, I believe, that you thought they were
12   recording that session.
13   A    I do not know -- he was manipulating.  While asking
14   questions he was manipulating the tape.
15   Q    Did they play a tape of David Lee and you talking for
16   you?
17   A    Yeah, he played that tape, but before he played he put
18   the tape.  Then after the playing that tape, he remove the
19   tape, put another tape.
20   Q    So -- and then after he put that other tape in there
21   and while they were questioning you, did you see him
22   operate the recorder as if he was recording it?
23   A    As I told you, he was doing like that to the tape
24   (indicating).  I do not know.  While asking questions he
25   was doing like that to the tape.
```

```
                                                                    WO
 1              IN THE UNITED STATES DISTRICT COU[RT]

 2                    FOR THE DISTRICT OF HAWAII

 3

                                         )
 4   UNITED STATES OF AMERICA,           ) CR 02-00209
                                         )
 5                       Plaintiff,      ) Honolulu, Ha[waii]
          vs.                            ) May 30, 2003
 6                                       ) 9:45 A.M.
     EDUARDO MINA,                       )
 7                                       ) Defendant's
                         Defendant.      ) Suppress Sta[tements]
 8                                       ) Defendant's
                                         ) Suppress Evi[dence]
 9

10                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE DAVID ALAN EZR[A]
11             CHIEF UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13
     For the Government:          J. MICHAEL SEABRIG[HT]
14                                CRAIG H. NAKAMURA,
                                  Office of the U.S. [Attorney]
15                                PJKK Federal Bldg.
                                  300 Ala Moana Blvd[.]
16                                Honolulu, HI 96850

17   For the Defendant:           CLIFFORD B. HUNT,
                                  500 Ala Moana Blvd[.]
18                                Honolulu, HI 96813

19   Official Court Reporter:     Debra Kekuna Chun,
                                  United States Dist[rict]
20                                300 Ala Moana Blvd[.]
                                  Honolulu, HI 96850
21                                (808) 534-0667

22

23

24
     Proceedings recorded by machine shorthand, trans[cript]
25   produced with computer-aided transcription (CAT)
```

**EXHIBIT B**

1   investigation?

2            MR. SEABRIGHT: Your Honor, objection. The issue
3   is whether or not Mr. Mina felt he was under arrest or not
4   free to leave, not what was in Agent Yamane's mind.

5            THE COURT: Overruled.

6   BY MR. HUNT:

7   Q    Please answer the question.

8   A    I'm sorry. Could you restate the question, please.

9   Q    Did you think that by playing that tape for Mr. Mina
10  or your purpose in bringing that tape for Mr. Mina was to
11  let him know that you had information on him and that it
12  would cause him to cooperate with the investigation?

13  A    Yes, that's correct.

14  Q    Now, you didn't record the interrogation of Mr. Mina
15  at the Kalihi substation, did you.

16  A    No, I did not.

17  Q    Why not?

18  A    It's FBI policy that, except for unusual
19  circumstances, we usually do not record interviews.

20  Q    Other than this FBI policy were there any other
21  reasons why you did not record the interrogation of Mr.
22  Mina at the Kalihi substation?

23           MR. SEABRIGHT: Your Honor, I'm going to object
24  again. It doesn't go to whether or not this individual
25  should have been given his Miranda warnings, and that's the

Oct. 16, 2003

Dear Atty. Hunt,

This will acknowledge with thanks receipt of your letter to Mr. Seabright dtd. Oct. 7, 2003 and Mr. Seabright's reply dtd. Oct. 10, 2003!

My Comments:

Larceny/theft/stealing is a form of dishonesty.

The prosecution will fight tooth and nail to give us the alleged note because it is fake in the sense that it was not written during my interrogation/investigation on Jan. 30, 2002. As I told you agent Yamane taped my investigation and the lady investigator sat in one corner w/ folded arms.

They suppressed the tape because it will not pass judicial scrutiny because of leading and misleading questions suggestive and even the name Penji was supplied by Yamane. I do not know if Penji is a woman or a man. Besides their lies will be exposed, because I really told them that I was sick, I told them to do it another day, that I ride in my car and they did not tell me that I am free to go.

Can I undergo a lie detector test re: genuineness of the note which was written after Jan. 30 and then present it to the court? I am 100% sure that it is fake and how sad it is convicted based on a fake do

**EXHIBIT C**

Please leave no stone unturned till we can show to the court that the note is fake. It is a sanitized transcription of the tape.

Sincerely,

[signature]

# UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
300 ALA MOANA BLVD. RM C-209
HONOLULU, HAWAII 96850

KEVIN S.C. CHANG
UNITED STATES MAGISTRATE JUDGE

TELEPHONE: (808) 541-1308
FAX: (808) 541-3519

November 25, 2003

Ed Mina
Number 0-2319-093
FDC Honolulu
P.O. Box 30080
Honolulu, HI 96820

Re: CR 02-00209-05 DAE

Dear Mr. Mina,

    I am in receipt of your letter dated November 23, 2003. You are represented by counsel and any requests should be made by your attorney. A copy of your letter will be forwarded to your attorney and the Assistant United States Attorney. As such, the court takes no action with regards to your November 23, 2003 letter.

Sincerely,

Kevin S.C. Chang
United States Magistrate Judge

cc:    Clifford Hunt, Esq. (w/enclosure)
       Assistant United States Attorney Craig Nakamura (w/enclosure)

COPY                    Nov. 23, 2003

Your Honor,
   I am writing you this letter in the name of justice.
   I told my lawyer to go for the note because I am very sure there was no note, as I testified. And if they (FBI agents) will produce one it is fake because it was not written on Jan. 30, 2002.
   If a note is produced, I want the note to be aged by a pretigious lab. I am very sure that it was not made on 1/30/02.
   Anyway, I will meet those agents on the Final Judgment Day and they will answer for their foul tactics and false testimonies, because All liars shall have their part in the lake which burneth w/ fire and brimestone which is the second death.
   I do hope that justice will be dispensed and will prevail.
   God bless you and your family.

                          Very truly yours
                          [signature]
                          Ed Mina
                          Defendant
                          Cr. No. 02-00209-05 DAE

The note is a sanitized transcription of my tape recorded interrogation.

Dec. 4, 2003

Dear Atty Hunt,

I received the notes today. Thank you. These are my initial observations.

1. My date of birth, etc are not in the notes. How can they remember my date of birth, etc? para 1 on p. 1.

2. Paras 5 & 6 of p. 1 are not in the notes. How did they know when I migrated to the U.S., that I was Insp. General, that I was employed in the L.A. in 1997?

These two alone are proofs that the notes were fabricated, hence its aging is impelling.

They can not bring out the tape because their lies and foul tactics will be exposed.

Furthermore:

Please see last line of p. 1 of note = "Pink Rose — the lady Kenji; maybe gave 200." Kenji was supplied by Yamane. I do not know if Kenji is a man or a woman. This indicates that Yamane personally knows Kenji and he told Campbell to correct the mistake by crushing out lady and the insertion of a he between "maybe" and gave.

Also the 9th line on p. 5 of note — Yun Hee was supplied by Yamane. Also the 12th line on p. 6 of note with a crush — the rough estimate is that of Yamane.

So long for now, please cause the

aging of the notes

Very truly yours,

[signature]



**U.S. Department of Justice**

*United States Attorney*
*District of Hawaii*

---

PJKK Federal Building  (808) 541-2850
300 Ala Moana Blvd., Room 6-100  FAX (808) 541-2958
Honolulu, Hawaii 96850

December 23, 2003

Clifford B. Hunt, Esq.
Four Waterfront Plaza, Suite 480
500 Ala Moana Boulevard, Box 27
Honolulu, Hawaii 96813-4908

      Re: United States v. Mina, et al.
           Cr. No. 02-00209 DAE

Dear Mr. Hunt:

    As you know, Mr. Mina has indicated that he is willing to take a "lie detector test" on issues relating to his prosecution. We are willing to accommodate Mr. Mina, and are requesting that he undergo a polygraph examination by a trained and certified FBI polygraph examiner. Among the questions we intend to ask Mr. Mina are 1) whether Task Force Agent Campbell took notes during Mr. Mina's interview at the police station on January 30, 2002; 2) whether Mr. Mina was advised that he was not under arrest and free to leave; and 3) whether Mr. Mina was forced by Agents Yamane and Campbell to accompany them to the police station. These are matters on which Mr. Mina has indicated he is willing to take a "lie detector" test.

    We are also willing to polygraph Mr. Mina on other questions relating to his guilt or innocence of the crimes charged in the Indictment, including whether he took money from bar owners in return for overlooking liquor violations.

    Please let us know what Mr. Mina's response is to our offer to have him tested by an FBI polygraph examiner.

                              Very truly yours,

                              EDWARD H. KUBO, JR.
                              United States Attorney
                              District of Hawaii

                              By *[signature]*
                              J. MICHAEL SEABRIGHT
                              CRAIG H. NAKAMURA
                              Assistant U. S. Attorneys

cc: Miles Yamane, Special Agent
    Federal Bureau of Investigation



**EXHIBIT D**

# Federal Forensic Associates, Inc.

Back to main site page

## *Albert H. Lyter, III*

### Education:

- B.S. Chemistry, Oklahoma City University, 1973
- B.S. Biology, Oklahoma City University, 1973
- M.S. Forensic Science, George Washington University, 1975
- Ph.D. Analytical Chemistry, University of North Carolina-Chapel Hill, 1999

### Training:

- Fiber Microscopy, Institute of Paper Chemistry, 1975
- X-ray Spectrometry, State University of New York, 1976
- Questioned Documents, United States Secret Service, 1977
- High Pressure Liquid Chromatography, Waters Associates, 1978
- High Pressure Liquid Chromatography, American Chemical Society, 1978
- Forensic Microscopy, McCrone Research Institute, 1978
- Surface Analysis Techniques, Physical Electronics, 1992
- Identification of Photocopiers, New Mexico State Police, 1983
- Canon Facsimile Workshop, American Society of Questioned Document Examiners, 1991

### Experience:

- September 1981 to present

    President and Chief Scientific Officer of Federal Forensic Associates, Inc.
    Engaged in consultation, examination, training, research and testimony in Forensic Science, including ink and paper analysis, trace evidence and questioned document examination.
    Qualified trace evidence areas include fire debris, explosives, paint, hair, fiber, glass and wood.

- January 1975 to September 1981

    Forensic Chemist, U.S. Treasury Department, Bureau of Alcohol, Tobacco and Firearms, National Laboratory Center, Rockville, Maryland.
    Engaged in consultation, examination, training, research and testimony as service to federal and state law enforcement.
    Court qualified in federal, state and military courts in over 33 states, U.S. Virgin Islands, Australia, Canada, Mexico, Malaysia and Singapore.
    Instructor at the FBI Academy, Federal Law Enforcement Training Center, Naval Investigative Service, Florida Department of Law Enforcement, colleges and universities.
    Lecturer at numerous scientific and legal organization meetings to include the American Academy of Forensic Sciences, American Society of Questioned Documents Examiners, California Association of Criminalists, International Association of Forensic Scientists.

### Professional Organizations:

- Fellow, American Academy of Forensic Sciences

http://www.inkdating.com/websitecv.htm



EXHIBIT E

1/6/2004

- Mid-Atlantic Association of Forensic Scientists
- Examination committee member to the American Board of Criminalistics.
- California Association of Criminalists
- Society of Forensic Ink Analysts - President
- Southwestern Association of Forensic Document Examiners
- International Association of Forensic Sciences
- American Society For Testing and Materials
- American Chemical Society

## Publications:

- Comparison of Paper Samples - IAI News, 1976
- Comparison of Typewriter Ribbon Inks by Thin Layer Chromatography - Journal of Forensic Science, 1977
- A Scientific Study of Pencil Lead - Journal of Forensic Science, 1978
- Analysis of Water Soluble Paper - Journal of Forensic Science, 1980
- Comparison of Typewritten Carbon Impressions - Journal of Forensic Science, 1982
- Examination of Ball Pen Ink by High Pressure Liquid Chromatography - Journal of Forensic Science, 1982
- Ink Analysis, A Key Element in Questioned Document Examination - Trial, 1983
- A High Performance Liquid Chromatographic (HPLC) Study of Seven Common Explosive Materials - Journal of Forensic Science, 1983
- Finding Fraudulent Documents - Family Advocate, 1989
- Attempted Determination of Authorship by Ball Pen Line Characteristics - Forensic Science International, 1990
- Analysis of Writing Ink - chapter in book HPLC in Forensic Science, 1982
- Contributions to the book Forensic Ink and Paper Examination by Brunelle and Reed, 1982
- Ph.D. Dissertation - Surface Characterization of Polymeric Materials by X-ray Photoelectron Spectroscopy and Time-of-Flight Secondary Ion Mass Spectrometry: Biomedical Materials and Forensic Applications

## Honors:

- Honorary Assistant Attorney General, State of Alabama
- Treasury Award for Outstanding Performance
- Honorary Member - Southwestern Association of Forensic Document Examiners

## Certification:

- Diplomat of the American Board of Criminalistics

## Cases of Note:

- Mormon Will of the late Howard R. Hughes
- Slander trial of CBS, Sixty Minutes and Dan Rather
- Nazi war crimes case of Ivan Demjanjuk

Contact Federal Forensic Associates FFA@InkDating.com

Back to main site page

Welcome to Federal Forensic Associates, Inc.
Good Morning
Time: 9:59 Date: 1/6/2004

# Federal Forensic Associates, Inc.

*Links*

Home page

FAQ

About Albert Lyter

Video Densitometer

Thin Layer Chromatography (TLC)

Scanning Electron Microscope

Fourier Transform Infrared Spectroscopy

Atomic Force Microscopy

X-ray Photoelectron Spectroscopy

Publications

Federal Forensic Associates Inc.
*John Hancock*
www.InkDating.com

*Federal Forensic Associates, Inc.*
*Post Office Box 31567*
*Raleigh, North Carolina 27612*
*(919) 848-3696    FAX (919) 848-9849*
*E-mail FFA@inkdating.com*

The validity of documentary evidence is of paramount interest in many different types of litigation. The medical record which is found to contain additions or interlineations can challenge the veracity of witnesses. The Last Will and Testament which is found to contain an ink formulation not commercially available until years after the supposed preparation date can prove the fraudulence of the instrument. The diary maintained by a victim of sexual harassment may be proven authentic as a contemporaneous record of events through analysis of the ink. All of these situations are actual cases in which Federal Forensic Associates, Inc. has provided expert services including examination, consultation and testimony. When you think a document is "too good to be true", it probably is. With advances in technology many documents which could not be analyzed just 5 years ago are possible sources of important information. We employ state-of-the-art technology for the analysis of any type of document evidence to answer questions relating to the method and timeliness of preparation. Paper, ink, typewriter, computer printer, carbon paper, xerographic copies and pencil are some of the materials previously examined by Federal Forensic Associates, Inc.

Check our list of Frequently Asked Questions for more details.

Here is a sampling of some of the tools we use.

**Scanning Electron Microscope** provides the capabilities of increased magnification for analysis of particulate evidence, paper fibers or the intersection of written lines to determine sequence of preparation. The increased capability of x-ray analysis allows for characterization of a variety of

evidence including paper, ink, toner and pencil. This characterization allows for a determination of common origin or source.

**Fourier Transform Infrared Spectroscopy** is a molecular spectroscopy which is used to characterize both organic and inorganic evidence. Its uses range from differentiation of toner samples, which indicates the use of multiple xerographic machines, to the detection of specific inorganic components in paper or pencil, which would aid in the determination of common origin.

The **Atomic Force Microscopy** allows for discrimination of surface features at the atomic level. This methodology is useful for the determination of line sequence and the characterization of surface features such as staple marks, creases in paper or other irregularities in the paper surface.

**X-ray Photoelectron Spectroscopy** is an atomic spectroscopy which is capable of elemental and molecular information. It is used for the characterization of toner materials and can give information regarding the age of xerographically produced documents.

**Thin Layer Chromatography** is a separation technique ideally suited to the characterization of ink, carbon, typewriter ink and other materials containing colored components. TLC is used routinely to differentiate between ink formulations and to identify the specific manufacture of an ink which appears on a questioned document.

**Reflectance Spectrophotometry, or Densitometry** is a quantitative technique which is used to determine the relative amounts of components present in inks, or the extraction characteristics of a given written entry. This information can help determine the number of different writing instruments used to prepare a given entry or the relative age of an entry in comparison with other writings.

**Electrostatic Detection Apparatus** is a methodology used to detect and visualize the indented impressions present on a page of paper. These impressions are the result of the preparation of writing on a document while in contact with the examined page of paper. The content of indented impressions and the identity of their source can allow for the determination of the sequence of preparation of different documents. Therefore an out of sequence document can be shown to have been prepared at a time different from its date.

Contact Federal Forensic Associates FFA@InkDating.com

Top of page

Site built by Ly-Core Solutions 12-2000
E-mail Ly-Core Webmaster