EDWARD H. KUBO, JR. #2499
United States Attorney
District of Hawaii

LAWRENCE L. TONG     #3040
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
E-mail:  Larry.Tong@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CIV. NO. 07-00061 DAE KSC |
| | ) CR. NO. 02-00209 DAE |
| Plaintiff/Respondent, | ) |
| | ) GOVERNMENT'S MEMORANDUM |
| vs. | ) OPPOSING DEFENDANT'S MOTION |
| | ) UNDER 28 U.S.C. § 2255 TO |
| EDUARDO C. MINA, | ) VACATE, SET ASIDE, OR CORRECT |
| | ) SENTENCE; DECLARATION OF |
| Defendant/Petitioner. | ) CLIFFORD B. HUNT; EXHIBITS |
| | ) "A"–"H"; CERTIFICATE OF SERVICE |

TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . iii

I.   STATEMENT OF THE CASE . . . . . . . . . . . . . . 1

     A.   Nature of Case and Underlying Proceedings . . . . . . 1

     B.   Factual Summary . . . . . . . . . . . . . . . . 2

          1.   The Liquor Commission and its enforcement
               authority . . . . . . . . . . . . . . . . 2

          2.   The FBI investigation into corruption at the
               Liquor Commission . . . . . . . . . . . . 4

          3.   The solicitation and acceptance of bribes by
               Liquor Commission investigators . . . . . . 8

          4.   Mina's participation in the enterprise . . . 11

          5.   Mina's admission of wrongdoing . . . . . . 17

          6.   The Jury's Verdict . . . . . . . . . . . . 19

          7.   The Court's Sentencing . . . . . . . . . . 20

     C.   The Ninth Circuit's Affirmance of the Judgment . . 20

     D.   Mina's Motion Under 28 U.S.C. § 2255 To Vacate,
          Set Aside, or Correct Sentence . . . . . . . . . 21

II.  APPLICABLE LAW . . . . . . . . . . . . . . . . . 22

III. SUMMARY OF THE GOVERNMENT'S RESPONSE TO MINA'S
     CLAIMS . . . . . . . . . . . . . . . . . . . . . 24

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . 26

     A.   Attorney Hunt's Advice On Plea Bargaining Did Not
          Constitute Ineffective Assistance Of Counsel . . . 26

     B.   Hunt Thoroughly Impeached The Government's
          Witnesses, and Presented The Available
          Exculpatory Evidence . . . . . . . . . . . . . . 32

i

Page(s)

    1.  The impeachment of Jennifer Chong . . . . . . . 33

    2.  The Alleged Failure to Present Exculpatory
       Evidence  . . . . . . . . . . . . . . . . 35

C.  Hunt's Decision Not to Call Certain Witnesses
    Did Not Constitute Ineffective Assistance Of
    Counsel Because Their Testimony Would Not Have
    Been Helpful To Mina's Defense  . . . . . . . . . 40

D.  Hunt's Decision Not To Pursue Mina's Claim That
    Notes Were Fabricated Did Not Constitute
    Ineffective Assistance Of Counsel or "Ethical
    Violations"  . . . . . . . . . . . . . . . . . . 41

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . 48

ii

TABLE OF AUTHORITIES

                                                                Page(s)

CASES

Baumann v. United States, 692 F.2d 565,
  (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 23

Blackledge v. Allison, 413 U.S. 63 (1977) . . . . . . . . . . 23

Boag v. Raines, 769 F.2d 1341 (9th Cir. 1985),
  474 cert. denied, U.S. 1085 (1986) . . . . . . . . . . . 48

Cooper v. Fitzharris, 551 F.2d 1162 (9th Cir. 1977) . . . . . 48

Guam v. Santos, 741 F.2d 1167 (9th Cir. 1984) . . . . . . . . 48

Shah v. United States, 878 F.2d 1156 (9th Cir. 1989) . . . . 23

Strickland v. Washington, 466 U.S. 668 (1984) . . . 22-23, 39-44

United States v. Booker, 543 U.S. 220 (2005) . . . . . . . 2, 20

United States v. Hearst, 563 F.2d 1331, (9th Cir. 1977) . . . 38

United States v. Mina, 178 Fed. Appx. 736 (9th Cir. 2006),
  2006 WL 1217890, cert. denied, 127 S.Ct. 280 (2006) . . passim

United States v. Molina, 943 F.2d 1440 (9th Cir. 1991) . . . 22

United States v. Rogers, 769 F.2d 1418 (9th Cir. 1985) . . . 23

United States v. Schaflander, 743 F.2d 714 (9th Cir. 1984),
  cert. denied, 470 U.S. 1058 (1985) . . . . . . . . . . . 23

Willhoite v. Vasquez, 921 F.2d 247 (9th Cir. 1990) . . . . 34-37

Page(s)

STATUTES and RULES

  United States Code

18 U.S.C. § 1951 . . . . . . . . . . . . . . . . . . . . . 1, 11

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . 29

18 U.S.C. § 1962(c) . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3006(A) . . . . . . . . . . . . . . . . . . . 44

18 U.S.C. § 3143(a) . . . . . . . . . . . . . . . . . . . 31

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . 21, 23


  Federal Rules of Evidence

Fed.R.Evid. 403 . . . . . . . . . . . . . . . . . . . 38


MISCELLANEOUS

  United States Sentencing Guidelines

U.S.S.G. § 1B1.1 . . . . . . . . . . . . . . . . . . . 30

U.S.S.G. § 2C1.1 . . . . . . . . . . . . . . . . . . . 29

U.S.S.G. § 2C1.1(b)(1) . . . . . . . . . . . . . . . . 29

U.S.S.G. § 2C1.1(b)(2)(A) . . . . . . . . . . . . . . . 29

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . . . 29

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . . . 29

iv

GOVERNMENT'S MEMORANDUM OPPOSING DEFENDANT'S MOTION UNDER
28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE

I.    STATEMENT OF THE CASE

    A.    Nature of Case and Underlying Proceedings

        On May 22, 2002, a federal grand jury in the District
of Hawaii returned a 57-count indictment charging defendant
Eduardo C. Mina ("Mina") and seven other individuals with
racketeering, conspiring to commit a racketeering offense, and
extortion under color of official right, violations of 18 U.S.C.
§§ 1962(c), 1962(d) and 1951.  See Clerk's Record ("CR") at 1.
The eight individuals were liquor investigators of the City and
County of Honolulu, and it was alleged that they used their
positions to solicit and accept pecuniary benefits with the
intent of influencing their official acts.  Mina was charged in
count 1 (racketeering), count 2 (racketeering conspiracy), and
counts 9, 33 and 57 (extortion under color of official right).
Id.

        On January 30, 2002, during the investigation of the
case, Mina was interviewed by investigating agents.  Mina
admitted accepting bribes from bar owners in return for
overlooking liquor law violations.  Shortly thereafter, Mina went
to the Philippines.  Mina was arrested on November 26, 2002 in
the Philippines, and was returned to Hawaii to face the charges
in the indictment.  Mina was ordered detained, and remained in
custody pending trial proceedings.

On April 22, 2004, trial began as to Mina and defendant Harvey T. Hiranaka.  The other six defendants pled guilty, and five entered into cooperation agreements with the government.  On May 18, 2004, the jury found Mina and Hiranaka guilty of all charges.

On May 12, 2005, the district court sentenced Mina. The sentencing took place after the Supreme Court decided United States v. Booker, 543 U.S. 220 (2005), and rendered the Sentencing Guidelines advisory.  The court calculated the advisory Guidelines range as 63-78 months, and sentenced Mina to a term of imprisonment of 65 months.

Mina took a direct appeal of the conviction.  On May 8, 2006, the Ninth Circuit affirmed the conviction and sentence. See United States v. Mina, 178 Fed. Appx. 736 (9th Cir. 2006), 2006 WL 127890 (memorandum), cert. denied, 127 S.Ct. 280 (2006).

According to the United States Probation Office, Mina was released from Taft FCI to Mahoney Hale on February 27, 2007, and his projected release date is August 7, 2007.

B.  Factual Summary

1.  The Liquor Commission and its
    enforcement authority

The City and County of Honolulu's Liquor Commission ("Liquor Commission") was responsible for administering Hawaii's

2

liquor laws and rules.  TR. 3-33.[1]  The Liquor Commission was headed by five commissioners appointed by the mayor of the City and County of Honolulu.  Id.  The Liquor Commission had sole jurisdiction to grant, suspend and revoke liquor licenses, and regulated the conduct of licensees.  Id.; TR. 3-55-56.  The Liquor Commission maintained an enforcement section, which inspected licensed premises to ensure compliance with the liquor laws and rules.  Id. at 37.

Mina and his seven co-defendants were investigators or supervising investigators in the Liquor Commission's enforcement section.  Investigators were quasi-law enforcement officers who enforced the liquor rules and laws.  TR. 3-67.  Investigators enforced laws against selling liquor to minors, prohibitions against employees drinking while on duty, and rules requiring employees to register and sign time cards.  TR. 3-73; TR. 3-39-40.  In the nudity bars, investigators also enforced rules prohibiting certain relationships between customers and performers.  TR. 3-73-74.

---

[1]    The trial transcripts in this case were in eleven sequentially numbered volumes.  References to the transcripts will be to "TR. __-__," with the numbers denoting the volume and page numbers of the transcript.  The transcript of the hearing on Mina's motion to suppress statements shall be referred to as "TR. 5/30/03," the transcript of the sentencing shall be referred to as "TR. 5/12/05," and the transcript of the hearing of Mina's motion to compel production of agent's notes shall be referred to as "TR. 11/20/03."

Investigators could issue written warnings, or notices of violation, in licensed premises. TR. 3-48-49, 74. Investigators had arrest authority in limited circumstances involving the provision of liquor to minors. Id. If a warning was issued, the investigator would submit a report containing the details. TR. 6-77. An investigator would conduct a compliance check within 14 days to determine whether the licensee corrected the violation. TR. 4-38. If the violation still existed, the investigator was required to issue a notice of violation. TR. 3-49; TR. 7-14. When an investigator wrote a violation, he was required to prepare an investigative report, which would be forwarded through the Liquor Commission administrator to the City's corporation counsel for prosecution. TR. 3-40-41. The licensee ultimately would have a hearing before the Liquor Commission, where the sanctions could include a reprimand, the imposition of fines, or the suspension or revocation of a license. TR. 3-41.

2.    The FBI investigation into
       corruption at the Liquor Commission

In 1999, Special Agent (SA) Miles Yamane of the Federal Bureau of Investigation (FBI) approached one of the liquor investigators, Charles Wiggins, concerning allegations of wrongdoing at the Liquor Commission. TR. 2-6. Wiggins was not willing to assist the FBI with an investigation at the time. Id. In September 2000, Wiggins had a change of heart and met with SA

4

Yamane and Honolulu Police Department Lieutenant Kathy Campbell, who was cross-deputized as a Task Force Agent. Id.; TR. 9-5. Wiggins described ongoing corruption involving liquor investigators who accepted money from bar owners in return for not enforcing the law. TR. 2-6-7. Wiggins admitted taking money as an investigator, and came forward because he felt the corruption was so widespread that an investigation would be initiated and reveal his own wrongdoing. TR. 3-66; TR. 6-29.

Wiggins worked the night shift, along with investigators Mina, Hiranaka, Andres, David Lee, Kenneth Wright, Samuel Ho, Collin Oshiro and William Richardson. TR. 3-73.[2] Hiranaka and Lee were supervisory investigators, and Andres was occasionally an acting supervisor. TR. 3-73. The investigators typically met before work at the Liquor Commission, where supervisors assigned teams and geographic areas to check on a particular night. TR. 3-67. Each team consisted of two investigators, and they did not know who they would be partnered with in advance. TR. 3-67-68.

In October 2000, Wiggins began cooperating with the FBI, and agreed to wear a recording device as part of the investigation. TR. 3-75; TR. 9-6. Wiggins typically worked from

---

[2] The night shift also included investigators Jared Redulla, Kerry Shannon, Cliff Muraoka, Alvin Akeo and Billy Friel, none of whom was believed to be accepting bribes from the bars. TR. 3-73-74; TR. 7-148. The investigators will be referred to by their surnames in this brief.

7:00 p.m. to 3:00 a.m., with occasional weekend shifts from 9:00 p.m. to 5:00 a.m.  TR. 2-7.  Before going on duty, Wiggins met with SAs Yamane and Campbell and they would affix the recorder. Id.; TR. 3-75-76.  When Wiggins found out who his partner was, the area he would handle, and the car which he would be driving, he would contact one of the agents.  TR. 2-9; TR. 3-12; TR. 3-76-77.[3]  The agents then placed Wiggins and his partner under surveillance throughout the work shift.  TR. 2-8.  Wiggins kept any money which he received segregated.  At the conclusion of the shift, Wiggins met with the agents, and the recorder was turned off.  If Wiggins collected any money, he turned it over to the agents, and identified where it came from.  TR. 2-9; TR. 3-13.

Wiggins wore the recording device on approximately 80 nights between October 20, 2000 until May 3, 2001.  TR. 2-8, 11, 36.[4]  After agreeing to cooperate with the FBI, Wiggins told supervisor Lee that he wanted to get money like the other investigators.  TR. 3-78.  Wiggins thereafter played the role of an investigator who was open to accepting bribes.  Id.  A typical shift resulted in about six to seven hours of recordings.  TR. 2-

---

[3]  If Wiggins was partnered with one of the investigators who was not believed to be accepting money, the agents turned the recorder off.  TR. 2-9.

[4]  Wiggins normally began work on the evening of one day, and finished during the early morning of the next day.  The agents dated the recordings as of the date on which the shift began.  TR. 2-14.

6

11-12.  On May 3, 2001, the agents stopped recording Wiggins's work shifts because they needed to move to the next phase of the investigation.  TR. 2-11.[5]  Wiggins continued to go to work after that date, and gave the FBI any money which he received.  TR. 3-80-81.  Wiggins provided the name of his partner each night, and described how he received the money.  TR. 3-78.  On approximately 20 occasions after May 3, 2001, Wiggins also wore the recording device during specific meetings with individuals.  TR. 2-36.

        The money received by Wiggins from liquor licensees was offered in evidence as Government's Exhibits 400-451.  TR. 4-26-27.[6]  The amounts were summarized on Government's Exhibit 452, which indicated the dates on which Wiggins collected money, the amounts collected, and the licensees from which it was collected.  TR. 3-56; TR. 4-27.  Between October 21, 2000 and May 3, 2001, Wiggins received a total of $7,340 from licensees.  Between May 3, 2001 and December 17, 2001, Wiggins turned over an additional $2,270 which had been collected.  TR. 3-21.  During the entire time, Wiggins played a passive role, never seeking money from licensees or the other investigators.  TR. 3-78.

--------------------------------------------------------------

[5]  SA Campbell explained that they had six-and-a-half months of recordings, and needed to prepare transcripts, and otherwise ready the case for grand jury and court proceedings.  TR. 9-8.

[6]  The agents placed the money in heat-sealed bags, and indicated the dates on which it was collected and seized.  TR. 2-16-17.  Because the money was turned over at the end of Wiggins's shift, it typically was dated one day later than the date of the corresponding recording.

3.    The solicitation and acceptance of
      bribes by Liquor Commission
      investigators

At trial, the government played excerpts of more than
50 recordings generated during the investigation.  Exs. 100-119,
121-144, 300-310; TR. 2-12-16.[7]  The government presented
testimony from Wiggins, certain bar owners, federal agents, and
from defendants Ho, Wright and Richardson, who pled guilty and
agreed to testify.  The evidence revealed that all eight
defendants received money from licensees in return for
overlooking violations.  The investigators solicited money in
various ways.  The investigators could point out violations, give
licensees a break, and hope to get money in return.  TR. 7-7.
Investigators would issue compliance checks and not issue
violations in return for money.  TR. 7-8.  In hostess bars,
hostesses typically solicited drinks from customers, which
violated liquor rules and regulations.  Many of the hostesses
failed to comply with registration requirements.  TR. 8-11.[8]  The
investigators thus would go into clubs and just sit, knowing that

---

[7]    Virtually all of the recordings were of specific events
which were charged as racketeering acts in count 1, and as
substantive extortion counts involving the various defendants.

[8]    In a January 26, 2001 conversation, Wiggins, Hiranaka
and Richardson noted that the investigators were not enforcing
the requirement that all hostesses register with the Liquor
Commission.  TR. 4-7; Govt. Ex. 134.  When the investigators
asked for registration cards, the owners at times offered money
instead.  TR. 4-7.

their presence would intimidate the hostesses and disrupt
business. TR. 7-7; TR. 8-32-33. As a result, the bar owners
typically gave investigators money to leave the premises. TR. 4-
10; TR. 8-10.

Some investigators shared money with each other by The money was paid to investigators in various ways.
Ho, Richardson, Wright and Wiggins testified that they received
money directly from licensees, either alone or while with
partners. TR. 3-81; TR. 7-8-9; TR. 7-96. The payments were
typically made in bars. TR. 3-82. A bar owner might give the
money to one investigator, or split it into two envelopes. TR.
3-82; TR. 7-146. The owners at times handed money to the
investigators, stuffed it in their pockets, or called them out of
the room to give them envelopes. TR. 3-126.[9] Although the
amounts varied, a typical payment was $100. TR. 3-83; TR. 7-146.

Some investigators shared money with each other by
distributing it in the Liquor Commission squad room. TR. 3-83.
When dividing the money, the investigators typically identified
the bar or bar owner from where it had come. TR. 3-83-84.
Investigators also told each other where they were collecting
money. TR. 3-97. Wright told other investigators to "take care"
of the clubs which paid him money, which meant not to write
violations there. TR. 7-11. If a licensee paid Wright, he would

---

[9] At times, the money would be given in red "lisi," a small
ornate envelope. TR. 3-116; Government's Ex. 112.

9

tell the others, so they could go to the same club for payments and know not to write violations. According to Wright, Lee, Hiranaka, Andres, Oshiro, Richardson and Ho also told him which licensees were making payments. TR. 7-12.[10]

Wright, Ho and Richardson testified that they did not enforce the liquor laws in establishments which paid money to investigators. TR. 7-15-16; TR. 7-87; TR. 7-150. In the case of hostess bars, Ho overlooked sex acts taking place at licensed premises which paid investigators. TR. 8-38. The investigators referred to licensees who paid money as "friends." The investigators understood they were not to write violations, or inspect the premises, of "friends." TR. 7-156; TR. 7-86. Supervisor Hiranaka introduced Ho to a number of bar owners, and told him whether they were "friends." TR. 8-7. It was Hiranaka's philosophy that once an investigator took money from a bar, violations could not be written there. TR. 3-124. On occasion, however, investigators would write a violation in a club which had paid money, just to "blast em" and remind them it was time to pay again. TR. 3-124; TR. 7-155.

---

[10] The investigators varied in their sharing of money. Wiggins, the cooperating investigator, and Ho did not receive money from Mina. TR. 6-99; TR. 7-148. Ho did not deal with Mina concerning accepting money from bars. TR. 8-47. Ho did not trust Mina, because he heard Mina approached bar owners directly and solicited money. Id. By contrast, Ho had a reputation among other investigators as not sharing all of the money which he collected on their behalf. TR. 3-123.

        4.   Mina's participation in the
             enterprise

        Mina solicited and accepted bribes, and participated in
the conspiracy with fellow Liquor Commission investigators.

        Wiggins testified that he was partnered with Mina on
December 8, 2000.[11]  Wiggins and Mina went to Gypsy Rose, a
liquor licensee.  TR. 4-16; Govt. Ex. 300.  Mina previously dated
Rose, the owner of the club.  TR. 5-24.  While at the club, Rose
offered to buy Mina a steak dinner.  TR. 5-24.  Rose then gave
Wiggins $40, and also gave money to Mina.  TR. 4-17.  Rose placed
the money in their pockets.  TR. 5-24.[12]

        On January 31, 2001, Richardson and Mina went to Club
Hollywood.  TR. 7-96.  Richardson went inside while Mina stayed
in the car, and the owner gave him $200.  Id.  Richardson then
gave Mina $100, and Mina accepted the money, saying it would come
in handy because he had just returned from vacation and had not
yet received his paycheck.  Id.  After the incident, Richardson
told Wiggins that he had given money from a bar to Mina.  TR. 5-

_____

        [11]  There was no consistency to the pairings, and Wiggins
was not often partnered with Mina.  TR. 6-4-8.

        [12]  This payment formed the basis for count 9, which charged
Mina with extortion under color of official right, a violation of
18 U.S.C. § 1951.  It was also charged as racketeering act (RA)
2a and 2b of the substantive RICO violation alleged in count 1.
See Indictment at 7, 24.

                              11

28.  Mina also told Wiggins that he had received the money from Club Hollywood.  TR. 6-89.[13]

On a date after May 3, 2001, while no longer wearing a recording device, Wiggins had a conversation with Mina about accepting money from licensees.  TR. 5-20-21.  Mina and he had gone to a club to investigate a complaint concerning unregistered employees.  Before entering the club, Mina told Wiggins to let him know if the owner was going to give them money, so that he could "give them a break."  TR. 5-20-21.  The investigators entered the club and found that the employees were not registered.  The owner did not give the investigators money, so Mina issued a notice of violation and a written warning for unregistered employees.  TR. 5-21.

On September 20, 2001, Wiggins and Mina were partnered and assigned to do routine inspections.  The pair visited Club Lokelani, where the owner gave each of them $40.  TR. 5-22.  The owner previously gave them money in December 2000.  Id.  On the same date, the investigators went to Club My Library, where Mina saw a female employee drinking beer while seated with a customer.  Mina obtained the time card to determine whether the employee was working at the time.  TR. 4-28-29.  The employee appeared to have been off-duty, but the time card was filled out incorrectly.  TR.

---

[13]  The payment was the basis for count 33, and was alleged as RA 42a and 42b of the RICO charge.  Indictment at 14-15, 37-38.

4-29.  Because of the discrepancy in the time card, Wiggins
suggested that, rather than writing a violation for an employee
drinking while on duty, they write a warning for inadequate time
card.  Id.  The bar owner asked for a break and made a motion
rubbing her thumb and forefinger together.  TR.  4-29-30.  Mina
then issued a warning concerning an inadequate time card.  TR. 4-
29-30; Govt. Ex. 500.[14]  When they got to the car, Mina told
Wiggins that he thought the owner was going to give them money.
TR. 4-30.

On September 21, 2001, the following day, Mina and
Wiggins were again partnered.  Mina suggested that they go back
to Club My Library.  TR. 4-33.  They went into the club, where
the owner sat down with them.  The owner said she did not want to
do anything illegal, and spoke privately with Wiggins.  The owner
asked Wiggins whether she could give money to Mina, and Wiggins
said it was up to her.  The owner then gave Wiggins an envelope
containing $200.  Wiggins gave $100 of that amount to Mina.  TR.
4-35.  Mina told Wiggins to tell him if bars were going to give
money, so that he would not write any violations.  TR. 4-37.[15]

---

[14]   A first time violation for a time card normally
resulted in a fine of $250.  TR. 3-52.  If repeat violations
occurred, the recommended penalties would increase.  TR. 3-54.

[15]   This was charged in count 57 (extortion), and as RA 55a
and 55b.  Indictment at 18, 51-52.

Mina's written warning at Club My Library was
introduced as Govt Ex. 500.  When a written warning was issued,
the investigator would conduct a two-week compliance check.  TR.
4-38.  If the violation had not been corrected, the investigator
was required to issue a violation.  TR. 7-14.  If the violation
had been corrected, however, an investigator could indicate that
the licensee had complied, and not write a violation.  TR. 4-38-
39.  In this case, Govt. Ex. 500, the warning issued by Mina,
bore the notation "complied," the date October 5, 2001, and
Mina's signature.  This meant that Mina did not write a violation
based on the warning which he had previously issued.  TR. 4-38-
39.

On October 5, 2001, Andres, Wright and Mina went to
Club My Library again, where Mina wrote a citation.  TR. 7-23.
The bar owner was upset, and was yelling while Mina wrote the
violation.  TR. 7-23-25.  Later that evening, Wright mentioned
the incident to other investigators.  TR. 7-26.  Ho asked, "What
are you doing," and said the bar owner had just taken care of
him, and that they were not supposed to write violations there.
TR. 7-26-27.

Ho called Wiggins upon learning of the citation.  TR.
6-20.  Ho was concerned that if something was not done to fix the
situation, the bar owner might complain and expose their
activities.  TR. 6-22.  Wiggins called Wright and Mina, who were

14

partners that evening.  TR. 6-20.  Wiggins asked Mina why he
wrote the violation since they had just received money from Club
My Library.  TR. 4-37; TR. 6-21; TR. 7-23.  Mina became upset and
said he had forgotten.  Mina said he would go back to the club,
take the violation back, and apologize to the owner.  TR. 4-38.

Mina and Wright returned to Club My Library.  Mina went
into the club for a few minutes.  Mina's daily activity report
for October 5, 2001 identified an assignment at Club My Library,
but did not reflect the writing of a violation.  TR. 7-29-31;
Govt. Ex. 502.  When later questioned by agents in this
investigation, Mina said he "tore up" the violation.  TR. 2-30;
TR. 9-26.

Jennifer Chong, the former owner of Club Tomorrow, a
licensed hostess bar, testified that she paid various
investigators including Mina.  TR. 6-113.  In early 2000, Chong
did not pay liquor investigators.  The investigators would come
in the bar, stare at customers and workers, and sit there for 20-
30 minutes.  TR. 6-113-14.  When the investigators were present,
the hostesses and customers felt uncomfortable and would leave.
TR. 6-114-15.  In approximately March 2001, Chong began to pay
liquor investigators, including Mina.  TR. 6-116. Chong made
three payments to Mina.  TR. 6-125.  The payments were for $300
or $500 each.  Id.  The first payment was in March 2001.  TR. 6-
125.  Chong gave an envelope containing money to Mina, while

15

another investigator was present.  TR. 6-125-26.  The second
payment was for $500, and took place a couple of months later.
TR. 6-130-31.  Chong put the envelope between Mina and the other
investigator who was present.  TR. 6-131-32.  The third payment
was in the middle of May 2001.  TR. 6-132.  When the third
payment was made, Mina mentioned a "trip."  TR. 6-135.

        Mina was with another liquor investigator each time
Chong paid him.  Chong paid a total of five investigators, who
tended to come in pairs.  TR. 6-118, 132.  The payments allowed
her to operate her business "more comfortably," TR. 6-120, as the
investigators would visit less frequently, and not conduct
inspections if they had been paid.  TR. 6-122, 130.

        You Hui Funk, the former owner of a bar called Club
Hollywood, also testified about payments made to Mina and other
investigators.  Funk operated Club Hollywood from February 2000
to December 2000.  During the grand opening, Lee approached
Funk, asked for a time card, and found a violation.  TR. 8-109.
Lee asked for $800, and said if other investigators came, he
would handle it.  TR. 8-110.  Funk did not have the money, so Lee
said he would return the following day.  Funk paid Lee $800 the
next day to avoid a ticket.  Id.  Funk paid a total of $3,000 -
$4,000 to six investigators, some of whom came in pairs.  TR. 8-
112-16.  The payments included a $100 payment to Mina around

16

Christmas 2000.  TR. 8-113.  Funk was about to leave on vacation, and did not want any violations issued while she was away.  Id.

Cliff Muraoka, a liquor investigator who did not accept bribes, also testified about Mina's activities.  While partnered with Mina between 1999-2001, Muraoka heard Mina tell licensees that he would be taking a "trip" to the Philippines and wanted to be "friends."  Mina told Muraoka numerous times that he did not write up violations which he observed because the licensee was his friend or another investigator's friend.  TR. 7-72.  Mina complained that the other investigators were taking more bribes than he was.  TR. 7-79.

Bank records for two accounts maintained by Mina at the Hawaii State Federal Credit Union were introduced at trial.  Govt. Ex. 350; TR. 9-11.  The records reflected that, between June 5, 2000 and January 25, 2002, $7,938.93 in cash was deposited into Mina's accounts.  TR. 9-13.

5.  Mina's admissions of wrongdoing

At trial, the government introduced admissions made by Mina on January 30, 2002 to SAs Yamane and Campbell.[16]  The

---

[16]  Prior to trial, the district court denied Mina's motion to suppress his statements.  As will be noted below, at pages 20-21, the Ninth Circuit later held that the statements should have been suppressed.  The Ninth Circuit held, however, that the admission of Mina's statements was harmless error, as the remaining evidence of Mina's guilt was overwhelming.  The government nonetheless presents evidence of the admissions to give context to Mina's present claim that Hunt failed to pursue a theory that the agents "fabricated" notes of his admissions.

17

agents told Mina they wanted to talk to him about his employment
at the Liquor Commission.  The agents played a May 3, 2001 tape
recording of a conversation involving Mina and Lee, his
supervisor.  After hearing the tape, Mina said he had found Jesus
Christ, and realized that what he was doing was wrong.  TR. 2-26;
Tr. 9-21.

Mina said he began working at the Liquor Commission in
1997 or 1998.  TR. 2-27; TR. 3-49.  Mina did not initially accept
money from licensees, but suspected that other investigators did.
In 1999, Mina began making trips to the Philippines.  Mina said
he made three or four trips that year, and needed money.  Mina
approached four to five bar owners and asked them to help pay for
his trips.  TR. 2-27; TR. 9-23.  They paid him, and Mina
thereafter considered them his friends, and began overlooking
violations in their bars.  TR. 2-27-28.  The payments ran from
$50 to $175.  TR. 2-28.

Mina said the collection of money was "rampant." TR. 2-
30-31.  Mina said there was an understanding among investigators
that they would stay away from bars which paid them money.  TR. 2-
28.  Mina admitted overlooking violations in bars which were
paying other investigators, and called it the "camaraderie way."
Id.; TR. 9-23.

Mina admitted receiving payments from Club Hollywood,
My Library, Femme Nu, Club Love, Pink Rose, New Casino, and Club

18

By Me.  TR. 2-28-29.  After receiving the payments, Mina would
not write violations in these bars, and sometimes would stay away
from them.  TR. 2-29.

Mina said he usually went on his own to collect money,
but admitted incidents where he received money from other
investigators.  TR. 2-29.  Mina admitted an incident where he and
Richardson went to Club Hollywood.  Richardson went into the bar,
while Mina stayed in the car.  Richardson returned to the car and
gave Mina $100, which Mina accepted.  Mina said he was surprised.
Id.  Mina recalled Andres giving him money which he said had been
received from supervisor David Lee.  TR. 9-24.  Mina also
admitted not writing violations at Club Mikado, because he knew
the owner was paying money to fellow investigator Ho.  TR. 2-30.

Mina recalled receiving $100 from Wiggins, after
Wiggins had gone into Club My Library.  TR. 2-30.  Sometime
later, Mina wrote a violation at Club My Library while partnered
with Wright.  Mina was reminded by other investigators that he
had previously received money from Club My Library.  Mina
admitted returning to Club My Library, where he "tore up" the
violation.  TR. 2-30; TR. 9-26.

6. The Jury's Verdict

On May 18, 2004, the jury found Mina guilty of all
charges, including racketeering (count 1), racketeering

19

conspiracy (count 2), and three counts of Hobbs Act extortion
(counts 9, 33 and 57).

       7.   The Court's Sentencing

       On May 12, 2005, this court sentenced Mina, as well as
his co-defendants Hiranaka and Andres.  The court made three
significant legal and factual rulings.  First, it applied the
2001 version of the Guidelines because the RICO conspiracy
extended past the November 1, 2001 effective date of those
Guidelines.  Second, it determined that the aggregate value of
payments received by all defendants in the conspiracy was more
than $200,000, but less than $400,000.  This figure was based on
an extrapolation from the amount of money received by Wiggins,
factoring in the amount of hours he worked versus that of the
defendants.  Finally, the court sentenced under the principles
set forth by United States v. Booker, 543 U.S. 220 (2005).  Based
on judicial fact finding, the court calculated the advisory
Guidelines range as 63-78 months.  The court noted that this
range was merely advisory, and sentenced Mina to 65 months.

   C.   The Ninth Circuit's Affirmance of the Judgment

       Mina took a direct appeal of the judgment.  Mina
asserted various claims, including: (1) the court erred in
denying his motion to suppress statements; (2) the court erred in
allowing evidence of his flight to the Philippines; (3) the court
gave erroneous jury instructions; (4) the prosecutor improperly

vouched for the credibility of his witnesses; (5) the evidence
supporting the conspiracy charge was insufficient; and (6) the
court's selection of the 2001 version of the Guidelines was
erroneous, and its factual findings of the amount of the loss
were clearly erroneous.

On May 8, 2006, the Ninth Circuit affirmed the
judgment.  See United States v. Mina, 178 Fed. Appx. 736 (9th
Cir. 2006), 2006 WL 1217890(memorandum), cert. denied, 127 S.Ct.
280 (2006).  The Ninth Circuit agreed with Mina's claim that he
was in custody at the time of his questioning, and that his
statements should have been suppressed.  The Court noted,
however, that the government's remaining evidence was
overwhelming, and thus the admission of Mina's statements was
harmless error.  2006 WL 1217890 at *1-2.  The Court rejected
all of Mina's remaining challenges, and affirmed the convictions
and the ultimate sentence of 65 months.

D.   Mina's Motion Under 28 U.S.C. § 2255 To
     Vacate, Set Aside, or Correct Sentence

On February 6, 2007, Mina filed this motion under 28
U.S.C. § 2255 to vacate, set aside or correct sentence on grounds
that his trial attorney, Clifford Hunt, provided ineffective
assistance of counsel.  Mina makes the following allegations:

1.   Mina claims that Hunt failed to give him proper
advice on the advantages and disadvantages of negotiating a plea
bargain versus going to trial in the case.  In particular, Mina

21

alleges that Hunt provided ineffective assistance of counsel by advising him to reject an alleged plea offer under which he would receive a sentence of only six months and be immediately released from custody.  Mina alleges he would have accepted the offer had he received proper counsel.

2.  Mina claims Hunt failed to present exculpatory evidence at trial, and to impeach government witnesses with evidence that he was not a member of the charged conspiracy.

3.  Mina claims that Hunt failed to call witnesses who would have presented favorable testimony at trial.

4.  Mina claims Hunt failed to consult with him, and acted unethically in respect to a motion to determine the date on which certain notes were made by government agents.

II.  <u>APPLICABLE LAW</u>

Mina alleges Hunt provided ineffective assistance of counsel in a variety of respects.  To sustain his burden of proving ineffective assistance of counsel, Mina must show (1) counsel's performance fell below an objective standard of reasonableness, and (2) resulting prejudice.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984).  In order to show prejudice, Mina must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u>; <u>see also</u> <u>United States v. Molina</u>, 934 F.2d 1440, 1447 (9th Cir. 1991).  "A reasonable

22

probability is a probability sufficient to undermine confidence
in the outcome." Strickland, 466 U.S. at 694.  Counsel is
presumed to have rendered effective assistance, and to have
exercised "reasonable professional judgment." Id. at 690.  Mina
thus must point to errors or omissions in the record to establish
his claim.  United States v. Rogers, 769 F.2d 1418, 1424 (9th
Cir. 1985).

In deciding Mina's motion, this court must give his
claims "careful consideration and plenary processing, including
full opportunity for presentation of the relevant facts." Shah
v. United States, 878 F.2d 1156, 1159 (9th Cir. 1989).  The court
is required to hold a hearing "[u]nless the motion and files and
records of the case conclusively show that the prisoner is
entitled to no relief[.]" See 28 U.S.C. § 2255.  In lieu of an
evidentiary hearing, however, the court may rely on the record,
which may be supplemented by documentary evidence, the court's
notes and recollection, and common sense.  Id.  A summary
dismissal of the motion is appropriate if Mina's allegations,
when viewed against the record, either do not state a claim for
relief, or are "palpably incredible" or "patently frivolous."
United States v. Schaflander, 743 F.2d 714, 717 (9th Cir. 1984),
cert. denied, 470 U.S. 1058 (1985), citing Blackledge v. Allison,
431 U.S. 63, 76 (1977) and Baumann v. United States, 692 F.2d
565, 571, 581 (9th Cir. 1982).

23

III.  <u>SUMMARY OF THE GOVERNMENT'S RESPONSE TO MINA'S CLAIMS</u>

Mina's claims concerning Hunt's alleged failures in respect to plea bargaining are both factually and legally unavailing.  Hunt thoroughly explored plea bargaining opportunities with Mina, and explained the advantages and disadvantages of pleading guilty versus going to trial.  Mina refused to pursue plea negotiations, however, because he steadfastly maintained his innocence, and refused to admit to any criminal wrongdoing.  Mina thus went to trial because he refused to admit guilt, and not because of any ineffective assistance of counsel as he now alleges.  Contrary to Mina's allegations, the government's final plea offer would <u>not</u> have resulted in a sentence of six months and his immediate release from custody.

Mina has not shown that Hunt failed to impeach witnesses or present exculpatory evidence.  The record reflects that Hunt confronted cooperating witnesses with evidence of their bias, and argued the point effectively during closing argument.  Hunt also elicited all available evidence suggesting that Mina was not part of the charged conspiracy.  As the Ninth Circuit has already found, the evidence against Mina was overwhelming.  There is no reasonable probability that the outcome would have been different had Hunt attempted to play excerpts of tape recordings of Mina's co-conspirators.

24

Mina has not shown that Hunt's decision not to call certain witnesses prejudiced him.  Hunt investigated Mina's claims that certain witnesses, including Mayor Jeremy Harris and Honolulu Police Department Chief Lee Donohue, would provide favorable testimony.  After interviewing the witnesses, Hunt reasonably determined that the witnesses would not provide exculpatory evidence, and thus decided not to call them.  This tactical decision did not constitute ineffective assistance of counsel.

Finally, Mina cannot show that Hunt was constitutionally ineffective in failing to pursue a theory that the government fabricated evidence.  Hunt thoroughly investigated Mina's claims that government agents fabricated notes of his January 2002 interview.  Hunt had Mina submit to a polygraph on the truthfulness of his claims, and Mina proved to be deceptive. The claim was inherently unbelievable, and Mina's failure of the polygraph made it even more so.  Hunt's decision not to pursue the claim fell well within the range of professionally acceptable advice.  To the extent Mina asserts other unspecified ethical violations, these claims were already rejected by the Office of Disciplinary Counsel, and should not be revisited here.

IV.  <u>ARGUMENT</u>

    A.  <u>Attorney Hunt's Advice On Plea Bargaining Did
Not Constitute Ineffective Assistance Of
Counsel.</u>

       Mina claims that Hunt provided ineffective assistance
of counsel by not advising him to accept a plea offer which
allegedly was made shortly before trial.  Mina claims the offer
would have resulted in a sentence of only six months, and that he
would have accepted it since it would have meant his immediate
release from custody.  This claim is factually and legally
unfounded.

       The circumstances surrounding plea negotiations in this
case are set forth in the attached declaration of attorney
Clifford S. Hunt ("Hunt declaration").  During the pendency of
the case, Hunt had several discussions with Mina concerning the
possibility of pleading guilty rather than going to trial.  Hunt
declaration, para. 6.  Hunt followed his normal practice of
explaining the nature of the charges, the maximum penalties, and
how the United States Sentencing Guidelines ("U.S.S.G.") would be
calculated.  <u>Id.</u>  Hunt also explained the procedures which would
be followed if Mina were to plead guilty, that Mina would have to
admit wrongdoing to a judge, and that the court could not
sentence him until after it calculated the Guidelines range.
Hunt also explained that the court would be required to sentence

26

within the range, unless there were grounds for an upward or downward departure.  Id.

Hunt further explained that Mina might receive a lesser sentence if he were to plead guilty, accept responsibility for his conduct, and show remorse.  Hunt explained that Mina might receive a longer sentence if he should contest the charges, testify on his own behalf, and have the court regard the testimony as false.  Hunt declaration, para. 9.

During these discussions, Mina refused to consider a plea bargain which did not guarantee him a specific sentence.  Id., para. 10.  Mina also consistently maintained that he was innocent of the charges against him, and that he would accept nothing less from the government than a dismissal of all charges against him.  Id., para. 9.  Hunt advised him several times that this position was unreasonable, considering the evidence against him, which included undercover audio tapes of him talking to Wiggins about how to accept money from a bar owner, statements from bar owners and co-defendants who were cooperating, and Mina's own statements to law enforcement agents.  Id.  Mina nonetheless steadfastly maintained that he would not admit to any wrongdoing.  Hunt believes Mina's present claim simply represents a change of heart after Mina was found guilty.  Id.[17]

---

[17]  The court may recall that Mina declined an opportunity to allocute, or accept responsibility for his conduct, at sentencing.  TR. 5/12/05 at 41.  This demeanor was entirely

The Hunt declaration also provides details about specific plea offers. By letter dated April 14, 2003, approximately five months after Mina's apprehension in the Philippines, the government offered Mina the opportunity to plead guilty to the racketeering conspiracy charge, and two Hobbs Act extortion charges. <u>See</u> Ex. "A" to Hunt declaration. Hunt communicated and explained the offer to Mina, who declined it. Hunt declaration, para. 7.

Shortly before the April 2004 trial, then Assistant U.S. Attorney J. Michael Seabright and Hunt had discussions concerning the possibility that Mina might plead guilty to two Hobbs Act extortion charges. <u>Id.</u>, para. 8. A written offer was never made. Hunt nonetheless calculated the Guidelines range which he believed would apply, and determined that the bottom of the range was greater than the time which Mina had already served. Hunt communicated the offer to Mina, who rejected it. <u>Id.</u>

In his motion, Mina admits that Hunt communicated the offer to him, and that he rejected it. Mina complains, however, that Hunt "failed to inform him at the time that by accepting this deal he would face a mere six month sentence." Memo at 4. Mina claims he had been in jail for 17 months at the time, and he

---

consistent with Hunt's statement that Mina steadfastly refused to admit any wrongdoing.

28

would have pled guilty since it would have resulted in his
immediate release from custody.  Memo at 4-5.  As noted above,
however, this was not the case.  The entry of guilty pleas to two
extortion offenses under 18 U.S.C. § 1956 would <u>not</u> have resulted
in a six month sentence.  A plea to such offenses would have
resulted in the application of U.S.S.G. § 2C1.1, which carried a
base offense level of 10.  Under U.S.S.G. § 2C1.1(b)(1), a two
level enhancement would have applied since Mina accepted more
than one bribe.  An additional two level increase for obstruction
of justice would have applied under U.S.S.G. § 3C1.1, given
Mina's testimony at the suppression hearing, which the court
found to be materially false.  Such an obstruction enhancement
would probably have denied Mina any reduction for acceptance of
responsibility.  <u>See</u> U.S.S.G. § 3E1.1, application note 4.  As a
result, the resulting offense level would have been at least 14.
With a criminal history category of I, the resulting advisory
Guidelines range would have been 15-21 months, and not six months
as Mina alleges.

        This advisory Guidelines range would also have been
increased if the relevant conduct of Mina's co-conspirators were
considered.  Under U.S.S.G. § 2C1.1(b)(2)(A), the offense level
would be increased by the amount of the bribes received by Mina's
co-conspirators, if the court found that such conduct was part of
a common scheme or plan, or the same course of conduct.  <u>See</u>

29

U.S.S.G. § 1B1.3, application note 9.  Such a finding was
virtually inevitable, as Mina was charged with being part of a
RICO enterprise, which by definition required proof of multiple
transactions.  The court ultimately found that the total amount
of bribes accepted by the enterprise was more than $200,000, a
finding accepted by the Ninth Circuit.  Even if Mina had pled
guilty to two substantive Hobbs Act extortions, a finding that
the relevant conduct was $200,000 would have a resulted in an
enhancement of 12 levels, which would have brought the offense
level to 26.  This in turn would have resulted in a range of 63-
78 months, precisely the range which Mina ultimately faced.

        The gravamen of Mina's claim is that Hunt communicated
the offer, but failed to advise him that accepting the offer
would have resulted in a six month sentence and immediate release
from confinement.  Mina is correct that Hunt did not tell him he
would have been immediately released if he had pled guilty.  Such
advice would have been wrong.  Hunt instead determined
(correctly) that the Guidelines range would have required Mina to
serve additional time.  While it is difficult to pinpoint the
exact range which would have applied, any calculation under the
Guidelines would have resulted in a range far in excess of the
six months which Mina now says he would have accepted.  There
were absolutely no assurances that Mina would have received only

30

six months, or that he would have been immediately released, as
he now claims.[18]

In view of the foregoing, there is no factual dispute
that Hunt communicated the government's oral offer, or that Mina
rejected it.  The sole basis for relief claimed by Mina is that
he would have pled guilty if he had known that he would have
received a six month sentence and been immediately released.
Even accepting this claim as true, it is obviously based on a
faulty assumption.  Based on an independent review of the
Guidelines, and its knowledge of this case, this court can

---

[18]    It is pure speculation for Mina to suggest that he
would have been immediately released had he entered guilty pleas.
A presentence report would have been prepared to calculate the
Guidelines range.  Had Mina pled guilty, there was a statutory
requirement that he be detained pending sentencing unless the
court found, by clear and convincing evidence, that he was not a
flight risk.  See 18 U.S.C. § 3143(a).  Given Mina's flight to
the Philippines, there is no reason to believe he would have been
released on bail.  His assumptions about the length of sentence,
as well as his immediate release, are thus unfounded.

31

determine that Mina would not have been released.[19]  Mina's claim

thus should be denied, without an evidentiary hearing.

B.    Hunt Thoroughly Impeached The Government's
      Witnesses, and Presented The Available
      Exculpatory Evidence.

Mina claims that Hunt failed to present exculpatory

evidence which would have raised doubt as to his participation in

the charged conspiracy.  See Motion, ground two; Memo at 1.  In

particular, Mina claims Hunt: (1) failed to impeach a key witness

with her evidence of bias; (2) failed to play tapes that would

have raised doubt about his role in the conspiracy; and (3)

failed to confront law enforcement witnesses with their grand

jury testimony.  As will be shown below, Hunt in fact impeached

the witness in question, and presented all available evidence

which tended to suggest that Mina was not a member of the

racketeering conspiracy.  Mina thus cannot show that Hunt's

---

[19]  This court presided over the lengthy trial and heard all
of the evidence.  The court characterized the Liquor Commission,
during the events in question, as being "nothing more than a
glamorized racketeering enterprise" where investigators extorted
bar owners "left and right," in an "open and notorious" manner.
TR. 5/12/05 at 44-46.  The court sentenced all eight defendants
for serious corruption offenses, and did not give any of them
(including cooperators) the six month sentence which Mina says he
would have received had he pled guilty.  At sentencing, the court
noted that Mina had fled to the Philippines after making
statements, and "lied, committed perjury" during hearings, and
had refused to accept responsibility.  TR. 5/12/05 at 44.  There
is no reason to believe the court would have given him only six
months, even if he had pled guilty immediately before trial.

performance fell outside the wide range of acceptable
professional conduct, much less any resulting prejudice.

    1.  <u>The impeachment of Jennifer Chong</u>

    Mina claims that Jennifer Chong, a government witness,
attempted to bribe Mina, and that criminal charges "were
downgraded to a mere obstruction of justice as an inducement to
testify falsely[.]" Motion at 6.  According to Mina, Hunt failed
to impeach Chong with the bias growing out of her agreement.
Contrary to Mina's claims, Hunt thoroughly impeached Chong.  As
noted above, Chong was a former hostess bar owner who paid
investigators so they would not inspect her business.  TR. 6-122,
130.  Chong testified that she made three payments to Mina.  On
direct examination, Chong testified that she had pled guilty to a
State misdemeanor offense involving the payment of money to a
liquor investigation.  <u>Id.</u> at 111.

    Under cross-examination by Hunt, Chong admitted (1) she
knew the payments were illegal, TR. 6-137, (2) she knew she could
have been charged with State bribery and extortion charges,
carrying sentences of up to five years of imprisonment, <u>id.</u>, and
(3) she negotiated a deal whereby she would cooperate with the
investigation, in return for being charged only with the
misdemeanor offense of obstructing liquor control operations.
TR. 6-138.  Hunt further brought out that Chong had not been
arrested or served any jail time on the offense, and expected the

33

United States Attorney's Office to report on her cooperation at
the time of sentencing.  Id. at 140-41.

In short, the jury knew that Chong avoided serious
felony charges by agreeing to cooperate, which included
testifying at trial.  Indeed, after Chong testified, the court
itself noted that Hunt had "explored very carefully" the fact
that she "was getting a potential benefit from cooperating[.]"
TR. 6-151.  The court summarized the value of Hunt's examination
as follows:

> The seminal thing that the jury needed
> to know was that she was testifying based
> upon an agreement to cooperate with the
> government.  In return for her cooperation
> and testifying truthfully, she was to get a
> benefit.  And the benefit was that she was to
> receive this arrangement that she received in
> state court, and it was agreed to between the
> government that they would not recharge her
> here.  Mr. Hunt covered all that quite well.

TR. 6-152 (emphasis added).[20]  As the court noted, Hunt
thoroughly covered the benefits which Chong received as a result
of her plea bargain.  The cross-examination "provided ample
opportunity for the defense to challenge, and for the jury to
weigh, [Chong's] credibility."  Willhoite v. Vasquez, 921 F.2d

---

[20]  The court made these comments after counsel for Mina's
co-defendant, Arthur Andres, attempted to repeat Hunt's
questioning on the plea bargain.

247, 249 (9th Cir. 1990).  Mina's complaint about Hunt's

impeachment of Chong is thus entirely unfounded.[21]

> 2.    The Alleged Failure to Present
>       Exculpatory Evidence

Similarly unavailing is Mina's claim that Hunt failed

to present evidence which would have shown that he was not a

member of the charged conspiracy.  Hunt aggressively pursued a

defense that Mina was not part of the charged conspiracy.  At

trial, Hunt brought out evidence on cross-examination that

suggested that some of Mina's fellow liquor investigators did not

give money to Mina, receive money from him, or even trust him.

Wiggins, the cooperating investigator, testified that

he did not initially believe Mina was accepting bribes.  TR. 6-

40.  Hunt brought out that on November 14, 2000, Wiggins was

partnered with Mina.  When the investigators returned to the

office, supervisor David Lee dismissed Mina, and then gave fellow

investigators Richardson, Ho and Wiggins $100 each.  TR. 6-41.

On November 27, 2000, Wiggins was again partnered with Mina.  On

---

[21]    During closing argument, Hunt also argued that Chong's
testimony should be discredited by her favorable plea bargain,
which gave her a motive to fabricate testimony.  Hunt told the
jury it had to view the testimony of "all the bar owners who
testified who pled guilty in state court," and the testimony of
the cooperating liquor investigators, with "great caution."  TR.
11-85.  Hunt claimed that the investigators' testimony had been
up "for sale," and "the price for their testimony was the hope of
a recommendation that they wouldn't do any serious jail time."
TR. 11-94-95.  He claimed the bar owners (such as Chong) were in
turn motivated by keeping their businesses, which allowed them to
make a living.  TR. 11-96.

that date, supervisor Lee again gave Wiggins $100 while Mina was using the restroom.  TR. 6-42.  On December 1, 2000, Wiggins asked fellow investigator Sam Ho whether he should share money with Mina.  Ho responded negatively, saying it would be like opening a Pandora's box.  TR. 6-43-44.

Ho also testified as a government witness.  On cross-examination by Hunt, Ho admitted that he did not share any money which he received with Mina.  TR. 8-16.  When Ho split the proceeds with other investigators, he made sure it was not done in Mina's presence.  TR. 8-17.  Ho admitted telling Wiggins that he did not think Mina should be included in the groups of investigators accepting money from the bars.  TR. 8-18-19.  Ho also heard investigator Kenneth Wright express frustration that he could not do anything when Mina was around.  Id.

Wright testified that he told Ho he was frustrated when paired with Mina.  On cross-examination, Wright admitted that he never saw Mina accept money.  Wright admitted sharing money which he collected with other investigators.  Wright sometimes collected money while paired with Mina, but he did not share money with him.  TR. 7-36-37.

Investigator Richardson also testified that he told other investigators about which bars were paying money, but did not recall talking directly to Mina about the matter.  TR. 7-85.  According to Richardson, Mina did not really fit in with the

36

group.  TR. 7-98.  Richardson also denied receiving any money

from Mina.  TR. 7-101.

      During closing argument, Hunt strenuously argued that

the foregoing testimony showed that Mina was not part of the

conspiracy.  Hunt began his closing as follows:

> If there ever was a conspiracy and a
> racketeering act in this case, it was a
> conspiracy to keep Ed Mina out of the
> conspiracy that the others were doing.  That
> was the conspiracy involving Ed Mina in this
> case.
>
> People don't invite you to join in
> criminal enterprise unless they know you,
> they trust you and they view you as a team
> player.  Every government witness in this
> case that mattered to the government's case
> had a reason to lie or exaggerate their
> testimony.

TR. 11-82.  Hunt repeatedly returned to this theme, arguing that

Ho told Wiggins that "Mina's out, don't share, he's not part of

it," TR. 11-99, and that Mina "shouldn't be included with the

guys."  Id.  Hunt further argued that, if the investigators did

not tell Mina where they got the money, "that means he's not part

of the conspiracy." TR. 11-114.[22]

_____

    [22]  In rebuttal, the government agreed that Mina "wasn't the
center of the conspiracy."  TR. 11-141.  The government noted,
however, that Mina had conspired with at least one other
investigator, William Richardson, as evidenced by his acceptance
of money from Richardson on January 30, 2001.  TR. 11-141-42.
The government also pointed to tapes where Mina admitted
accepting bribes, and told fellow investigators about the
"symbiosis" concerning their acts.  TR. 11-153-54.  The
government thus argued that this evidence demonstrated that,
while not the leader of the group, Mina joined the conspiracy and

In the face of this evidence and argument, Mina
complains that Hunt failed to introduce certain tape recordings.
Based on hearings with the court, however, Hunt understood that
the undercover tape recordings of Mina's co-conspirators'
statements could not be introduced as substantive evidence if the
speakers admitted making the statements on cross-examination.
Hunt declaration, para. 14.  This belief was eminently
reasonable, as the court had discretion to exclude recordings
which would be cumulative and time-consuming.  See United States
v. Hearst, 563 F.2d 1331, 1349 (9th Cir. 1977)(noting that once
witnesses admitted making statements on tape, the recordings
could be excluded under Fed. R. Evid. 403). A review of the trial
transcripts reveals that Hunt effectively used the tape
recordings to refresh the memories of the witnesses, who then
admitted taped statements concerning Mina's minimal involvement
in the conspiracy.[23]  While Mina may have wanted the tape
recordings to be played, he suffered no prejudice, as Hunt

---

benefitted from it.

[23]  Hunt liberally used transcripts and reports to elicit
the favorable testimony outlined above.  See, e.g., TR. 6-40-48
(cross-examination of Wiggins); TR. 8-16-19 (cross-examination of
Ho); TR. 736-37 (cross-examination of Wright); and TR. 7-85-101
(cross-examination of Richardson).  This showed Hunt's thorough
preparation, and demonstrates that, while the tape recordings
were not played, he elicited the substance of the recordings
through live testimony.

38

thoroughly elicited evidence which suggested that Mina was not a major participant in the conspiracy.

Finally, Mina complains that Hunt failed to impeach SA Yamane and Lt. Campbell with their grand jury testimony. Mina claims that these witnesses testified that some of Mina's co-conspirators said they sent Mina home before dividing their criminal proceeds, and that Mina acted alone in relation to accepting bribes. Such statements, however, were inadmissible hearsay at trial. Moreover, as noted above, Hunt thoroughly elicited any exculpatory information, which allowed him to argue that while Mina may have accepted money, he was not part of the charged conspiracy.

In summary, Hunt presented and argued the substance of all available exculpatory evidence on Mina's behalf. Mina cannot show that any alleged failure to play tape recordings or cross-examine witnesses fell "outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. at 694. Nor can he show that any attempt to introduce the recordings, or hearsay statements of co-conspirators would have succeeded, much less that there was a reasonable probability that the outcome of the case would have been different had they been admitted. Mina's claims should be denied.

39

C.   Hunt's Decision Not to Call Certain Witnesses
     Did Not Constitute Ineffective Assistance Of
     counsel Because Their Testimony Would Not
     Have Been Helpful To Mina's Defense.

Mina claims that Hunt's failure to call certain
witnesses to testify constituted ineffective assistance of
counsel.  Mina claims he provided Hunt with an "extensive" list
of witnesses whose testimony would have been favorable.  Mina
specifically claims Jeremy Harris, former Mayor of the City and
County of Honolulu, would have been a "particularly important"
witness who would testify that Mina disclosed corruption at the
Liquor Commission before the FBI even began its investigation.

As set forth in Hunt's declaration, however, Mayor
Harris would not have provided favorable testimony.  Mina claimed
he met with Mayor Harris about corruption at the Liquor
Commission.  Hunt subpoenaed Mayor Harris to testify, and sought
the production of appointment records which would have reflecting
a meeting with Mina.  Hunt declaration, para. 11.  By speaking
with David Arakawa, Corporation Counsel for the City and County
of Honolulu, Hunt determined that Mayor Harris did not recall any
meeting with Mina where corruption was disclosed, and that his
appointment records did not reflect any meetings with Mina.  Id.

Mina had also asked Hunt to call Lee Donohue, former
Chief of the Honolulu Police Department ("HPD") as a witness.
Mina claimed that Mayor Harris contacted Chief Donohue because
Mina told Harris about corruption at the Liquor Commission.  Id.,

40

para. 12.  Hunt investigated this claim and learned that Chief
Donohue had in fact received a report in early 2002 from Mayor
Harris concerning corruption at the Liquor Commission.  Id.
Through discussions with former Liquor Commission administrator
Wallace Weatherwax, however, Hunt learned that this report
actually concerned an investigation initiated by the Liquor
Commission into whether Mina was soliciting money from licensees.
Weatherwax alerted Mayor Harris of the investigation, and Mayor
Harris then advised HPD Chief Donohue of the matter.  After
considering this information, Hunt decided not to call either
Mayor Harris or Chief Donohue to testify at trial.  Id., para.
13.

        Hunt's decision was eminently reasonable.  Mina told
Hunt the witnesses would provide favorable testimony.  After
investigating the matter, Hunt determined their testimony would
in fact be inculpatory.  Hunt's decision not to call them was
unassailable.

    D.   Hunt's Decision Not To Pursue Mina's Claim
         That Notes Were Fabricated Did Not Constitute
         Ineffective Assistance Of Counsel or "Ethical
         Violations"

        Mina's final claim is that Hunt "failed to properly
consult and deal with him in an ethical manner."  Memo at 2.
Although couched as an ethical complaint, the gist of the claim
seems to be that Hunt failed to pursue a theory that Lt. Campbell
"fabricated" notes of Mina's January 30, 2002 interview, and that

41

evidence of this fabrication would have resulted in a dismissal
of the indictment.  This claim is entirely without merit.

As noted above, Mina made statements to Lt. Campbell
and SA Yamane on January 30, 2002 at the Kalihi police station.
During the interview, Mina admitted soliciting and accepting
money from multiple bar licensees over a period of years.  A week
after giving the statement, Mina left Hawaii and went to the
Philippines, where he remained until his arrest in November 2002.

Following his apprehension, Mina told Hunt that he was
coerced into making the statements, and had not admitted any
involvement in the conspiracy.  Hunt declaration, para. 16.  Hunt
filed a motion to suppress Mina's statements.  Id.  Prior to the
hearing on the motion, Hunt requested and obtained a typewritten
FBI report of Mina's statements, and portions of Lt. Campbell's
handwritten rough notes of the interview.  Id.  The court held a
suppression hearing on May 30, 2003, during which it took
testimony from SA Yamane, Lt. Campbell and Mina.  After hearing
the evidence, the court denied the motion.  Id.

Following the denial of the motion, Mina told Hunt that
Lt. Campbell's notes were "fabricated."  Id., para. 17.  Mina
asked Hunt to obtain a complete set of the notes, so that he
could review them for inconsistencies and prove they were fake.
Id.  Mina thereafter asked Hunt to obtain the original notes, so
that an expert could inspect them to determine when they were

42

written.  Id.  Mina told Hunt that the notes were prepared in response to his motion to suppress, which was filed more than a year after the date of the interrogation.  Id.  In almost fifteen years of criminal defense practice, Hunt had never heard of police fabricating notes of a suspect interrogation, and he believed the likelihood that the police did so in this case was "extreme to non-existent."  Id., para. 18.  Hunt conferred with other experienced criminal defense attorneys to see whether they had encountered a situation where notes were fabricated, or had any information that the specific investigators involved in this case might be capable of such fabrication.  None of the other attorneys had heard of such a fabrication, or had heard anything negative about the investigators.  Id.

Hunt attempted to dissuade Mina from taking such an "extreme and incredible" position in the case, but Mina insisted that it be pursued.  Id., para. 19.  On October 3, 2003, Hunt filed a motion to compel production of the notes.  The motion, which was opposed by the government, was heard on November 20, 2003.  Against Hunt's advice, Mina testified at the hearing to support his claim.  Id.  Mina testified that he was not told he was free to leave when questioned by Lt. Campbell and SA Yamane, and that he was willing to undergo a polygraph on this point.  TR. 11/20/03 at 17.  Mina testified that, contrary to the agents' testimony, his interview had been tape recorded.  Id. at 15.

43

Mina further testified that he was "very positive" that Lt.
Campbell sat away from the interview table, and did not take any
notes.  Id. at 20-21.  At the conclusion of the hearing, U.S.
Magistrate Judge Kevin Chang took the matter under advisement.
Magistrate Judge Chang later ordered that the government produce
notes of the interview, which the government did.

        Hunt received the notes and provided them to Mina.
Hunt thereafter contacted the Technical Advisory Service for
Attorneys (TASA), a consulting firm, to determine when the notes
were written.  See Ex. "B" to Hunt declaration.  Hunt also
prepared, and lodged, an ex parte motion seeking authorization to
incur $4,920 under 18 U.S.C. § 3006(A) for such an examination.
Ex. "C" to Hunt declaration; CR 199.  In his affidavit in support
of the ex parte motion, Hunt noted that Mina "has been insistent
with defense counsel that the agents did not take notes of the
interrogation because they were taping it and that the notes were
fraudulently created sometime after the interrogation and before
the suppression hearing to cover up the taping."  See January 6,
2004 declaration of Clifford B. Hunt at para. 10, which is part
of Ex. "C" to the Hunt declaration attached hereto.

        On December 23, 2003, while Hunt was taking steps to
retain an expert, the government sent a letter offering Mina the
opportunity to submit to a polygraph examination administered by
the FBI on the substance of his testimony at the suppression

44

hearing.  Ex. "D" to Hunt declaration.  The topics to be covered included whether Lt. Campbell had taken notes during Mina's interview.  Id.  Before agreeing to such a polygraph, Hunt decided to have Mina take a polygraph administered by a defense retained polygrapher.  Hunt thus obtained court funds for the administration of a polygraph by Michael Patrick Orian, of Orian's Polygraph Investigative Service, and arranged for the examination to occur at the Federal Detention Center.  Ex. "E" to Hunt declaration.  One of the questions to be asked of Mina was whether the police took notes during the interview.  Hunt declaration, para. 22.

Hunt explained the polygraph examination to Mina.  Id., para. 23.  Hunt advised Mina that the defense polygraph would include a question of whether he took notes, and that he would withdraw his motion for authorization to "age" the notes if Mina failed the examination.  Mina agreed.  Id.  Mina insisted that he would pass the question, and others, because the police were lying about the interrogation.  Shortly after the examination, Orian advised Hunt that Mina failed all of the questions concerning whether he was coerced into making a confession, as well as the question of whether the police took notes.  Id., para. 24.  Based on this conversation, Hunt advised Orian that a written report was not necessary.  Id., para. 25.  Hunt also advised the government that Mina declined to take a polygraph

45

examination administered by the FBI.  Ex. "F" to Hunt
declaration.  In accordance with his earlier agreement with Mina,
Hunt also withdrew the ex parte request for funds to retain an
ink dating expert.  Hunt declaration, para. 25.  Hunt advised the
court and, on March 25, 2004, the court filed an order denying
the ex parte motion which had been lodged.  Hunt felt it was
inappropriate to seek almost $5,000 in court funds for the expert
where Mina's claims seemed "desperate and incredible," and he was
unable to pass a polygraph administered by an expert regarded as
being favorable to the defense.  Id.

        While preparing for trial, Hunt advised Mina that he
had withdrawn the ex parte motion pursuant to their agreement.
Mina initially did not say anything, but later sent a March 7,
2004 letter accusing Hunt of trying to protect the police.  On
March 11, 2004, Hunt responded to Mina.  Ex. "G" to Hunt
declaration.  Hunt noted that he chose not to pursue the forensic
examination because Mina failed the January 26, 2004 polygraph
examination.  Hunt wrote that the examiner found Mina "deceptive"
when he denied seeing Lt. Campbell take notes during the
examination.  Hunt further advised Mina that Orian was "one of
the most experienced and respected polygraph examiners in the
State and, in my opinion, gives clients the benefit of the doubt
in his examinations."  Ex. "G" to Hunt declaration.  Hunt
concluded the letter by noting that he did not seek to protect

46

the law enforcement agents, but instead wished to defend Mina and "secure [an] acquittal in any lawful and ethical way possible." Id.

In his 28 U.S.C. § 2255 motion, Mina alleges that Hunt failed to consult with him before withdrawing the motion for an expert examination of Lt. Campbell's notes.  Mina also claims that Hunt lied about filing the motion in the first place.  Mina cites the fact that the motion and order denying the motion were filed simultaneously on March 25, 2004 as evidence that Hunt lied to Mina and "railroaded" the matter.  Mina claims that, had the motion been "properly presented and considered by the court, it would have shown the government misconduct sufficient to justify dismissal of the indictment in this case[.]" Memo at 13.

As noted in the Hunt declaration, however, the ex parte motion and order denying the motion bear the same filing date because of procedures followed by the court.  An ex parte motion for expenditure of Criminal Justice Act (CJA) funds is normally lodged with the court pending consideration by a magistrate.  If the court denied the motion, it normally files both the motion and the order denying motion at the same time.  This process was followed here.  The simultaneous filing of the motion and order thus do not show that Hunt attempted to deceive or trick Mina, as Mina now claims.  On the contrary, Hunt's declaration and the supporting documents instead show that he thoroughly investigated

47

Mina's claim, however unbelievable it seemed, and chose not to pursue it only when it became apparent that the claim was not likely to succeed.

A failure to raise a meritless argument does not constitute ineffective assistance of counsel. Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985), cert. denied, 474 U.S. 1085 (1986), citing Cooper v. Fitzharris, 551 F.2d 1162, 1166 (9th Cir. 1977). "A tactical decision by counsel with which the defendant disagrees cannot form the basis for a claim of ineffective assistance of counsel." Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984). Hunt's decision not to pursue a claim which he regarded as "desperate" and "incredible" did not fall outside the wide range of acceptable professional conduct. Moreover, Mina has wholly failed to show that there is a reasonable probability that the indictment would have been dismissed had the theory be pursued.[24]

V.    CONCLUSION

A careful review of the trial record, as supplemented by the documentary evidence presented with Hunt's declaration, reveals that Mina's allegations lack merit. As the Ninth Circuit

---

[24]    Mina's complaints may be viewed as allegations of ethical violations on Hunt's part. Mina has previously asserted most of the same claims in an August 16, 2004 complaint filed against Hunt with the State of Hawaii, Office of Disciplinary Counsel (ODC). Hunt declaration, para. 29. On December 8, 2004, after reviewing materials submitted by Mina and Hunt, the ODC dismissed the complaint. See Exhibit "H" to Hunt declaration.

held on direct appeal, the evidence against Mina (even without his admissions) was overwhelming.  The record reveals that Hunt was a nonetheless an aggressive and effective advocate on Mina's behalf, and thoroughly investigated Mina's claims, even where implausible.  Mina cannot point to any errors or omissions which rendered Hunt's performance deficient, or any resulting prejudice.  The motion thus should be denied, without an evidentiary hearing.

Dated: April 30, 2007, at Honolulu, Hawaii.

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii


 /s/ Lawrence L. Tong
LAWRENCE L. TONG
Assistant U.S. Attorney

49

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the dates and by the methods of service noted below, the true and correct copy of the foregoing was served on the following at their last known address:

Served by certified mail:

Eduardo Mina, #02319-093                April 30, 2007
Taft Correctional Institution
P.O. Box 7001
Taft, CA 93268

Defendant/Petitioner Pro Se

DATED:  Honolulu, Hawaii, April 30, 2007.

                            EDWARD H. KUBO, JR.
                            United States Attorney
                            District of Hawaii


                            By /s/ Lawrence L. Tong
                              LAWRENCE L. TONG
                              Assistant U.S. Attorney

                            Attorneys for Plaintiff
                            UNITED STATES OF AMERICA