IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,  | ) CIV. NO. 07-00061 DAE KSC |
|  | ) CR. NO. 02-00209 DAE |
| Plaintiff/Respondent, | ) |
|  | ) DECLARATION OF CLIFFORD B. |
| vs. | ) HUNT; EXHIBITS "A" - "H" |
|  | ) |
| EDUARDO C. MINA, | ) |
|  | ) |
| Defendant/Petitioner. | ) |
|  | ) |

DECLARATION OF CLIFFORD B. HUNT

CLIFFORD B. HUNT declares as follows:

1. I am an attorney at law, and have been licensed to practice in the State of Hawaii since 1983.

2. I was counsel for Eduardo C. Mina ("Mr. Mina") in the case of United States v. Eduardo C. Mina, Cr. No. 02-00209 DAE, in the United States District Court for the District of Hawaii. The indictment charged Mr. Mina, a former investigator with the City and County of Honolulu Liquor Commission, with federal racketeering, conspiracy to violate the racketeering act, and Hobbs Act extortion violations. Mr. Mina was one of eight defendants in the case.

3. I represented Mr. Mina throughout all district court proceedings, starting with his initial appearance in the case in 2002, and continuing through a jury trial in April-May 2004. I subsequently withdrew as Mr. Mina's counsel. Mr. Mina was represented by David Klein, Esq. at sentencing.

4. I have reviewed Mr. Mina's motion under 28 U.S.C. § 2255 to vacate, set aside or correct sentence in this case, as well as his supporting memorandum. Mr. Mina alleges that I rendered ineffective assistance of counsel in several respects. I have also reviewed an order issued by United States District Judge David A. Ezra finding that Mr. Mina has waived the attorney-client privilege as to the matters raised by his motion.

5. I make this declaration in response to the allegations made by Mr. Mina, and am competent to testify to the matters set forth herein if required by the court.

<u>The conversations concerning plea negotiations</u>

6. During my representation of Mr. Mina, I had several conversations with him concerning the possibility of entering a guilty plea in the case. I followed my normal practice of explaining the nature of the charges in the case, the maximum penalties, and how the United States Sentencing Guidelines (which were then mandatory) applied. I explained the procedures which would be followed if he chose to enter a guilty plea, explained

to Mr. Mina that he would have to admit he was guilty of the charges to which he pled guilty, and that the court would sentence Mr. Mina only after it calculated the Guidelines range. I further explained that the court would be required to sentence Mr. Mina within the Guidelines range, unless there were grounds for an upward or downward departure.

7. Mr. Mina was apprehended in the Philippines in November 2002, and was ordered detained pending trial after his return to Hawaii. By letter dated April 14, 2003, then-Assistant U.S. Attorney J. Michael Seabright, who is now a United States District Judge, made a plea offer on behalf of the government. A copy of the letter is attached hereto as Exhibit "A." The government offered to allow Mr. Mina to plead guilty to the racketeering conspiracy charge, and to two Hobbs Act extortion counts. I communicated the offer to Mr. Mina, and explained the advantages and disadvantages of going forward to trial. After our discussions, Mr. Mina rejected the government's written offer.

8. Shortly before the April 2004 trial, I had a discussion with then-AUSA Seabright about the possibility of Mr. Mina pleading guilty to only two Hobbs Act extortion charges. Mr. Mina had been in custody since November 2002 at the time. I calculated the Guidelines range which would apply if Mr. Mina

entered the pleas, and determined that the minimum range was greater than the time which Mr. Mina had already served. I communicated the offer to Mr. Mina, and he rejected it.

    9. During discussions about plea negotiations, I advised Mr. Mina that he might receive a lesser sentence if he were to plead guilty, accept responsibility for his conduct, and show remorse. I also explained that Mr. Mina faced the possibility of receiving a longer sentence if he should contest the charges, testify on his own behalf, and have the court regard that testimony as false. Throughout the case, Mr. Mina consistently maintained that he was innocent of all charges brought against him, and that he would not accept anything from the government other than a dismissal of all charges. I advised Mr. Mina several times that this position was not reasonable, given the evidence against him. Such evidence included undercover audio tapes of him talking with the undercover liquor investigator about how to accept money from bars, a taped instance where he seemed to acknowledge receiving money from a bar owner, the anticipated testimony of bar owners and cooperating co-defendants that Mr. Mina accepted money, and Mr. Mina's own admissions to agents. Mr. Mina steadfastly maintained that he would not admit to any wrongdoing.

    10. In addition to maintaining his innocence, Mr. Mina

made it clear that he would not consider any plea offer which did not guarantee a specific sentence. The government was not able to give such assurances. I did not receive any offer from the government that would have guaranteed Mr. Mina a sentence of six months, or his immediate release from custody, as he now alleges in his motion. I believe Mr. Mina's present claim represents a change of heart after he was found guilty at trial.

<u>The decision not to call certain witnesses</u>

11. Mr. Mina alleges that I failed to call certain witnesses at trial who would have provided favorable testimony. One of those witnesses was Jeremy Harris, then Mayor of the City and County of Honolulu. Mr. Mina said he met with Mayor Harris and advised him about corruption at the Liquor Commission before the FBI began its investigation. I subpoenaed Mayor Harris to testify, and also sought the production of his appointment records. Through David Arakawa, the City corporation counsel, Mayor Harris advised me that he did not recall such a meeting with Mr. Mina, and that the appointment records which I had subpoenaed did not reflect any meetings between Mr. Mina and Mayor Harris during the relevant time period.

12. Mr. Mina also said that Lee Donohue, then the Chief of the Honolulu Police Department ("HPD"), would testify that Mayor Harris contacted him because Mr. Mina told Harris about

corruption at the Liquor Commission.  I subpoenaed Chief Donohue and spoke with him about Mr. Mina's claims.  Chief Donohue advised that he had received a report from Mayor Harris concerning possible corruption at the Liquor Commission in early 2002.  Based on conversations with Liquor Commission administrator Wallace Weatherwax, however, I determined that the report which Chief Donohue referred to was actually an investigation initiated by the Liquor Commission into whether Mr. Mina had solicited money from licensees.  I further determined that Mr. Weatherwax had advised Mayor Harris of the investigation, and that Mayor Harris had in turn contacted Chief Donohue.  I thus concluded that Mayor Harris had talked to Chief Donohue because Mr. Mina himself was being investigated, and not because Mr. Mina had disclosed corruption at the Liquor Commission.

13.  On the basis of the foregoing investigation, I did not call Mayor Harris or Chief Donohue to testify at the trial, as I did not believe it would be in Mr. Mina's best interests.

<u>The failure to play undercover tapes</u>

14.  Mr. Mina alleges that I provided ineffective assistance of counsel because I failed to play undercover tape recordings where certain of his co-conspirators made statements

tending to show that he was not a part of the charged conspiracy. This case involved a substantial number of undercover tapes. Prior to trial, counsel conferred about which portions of tapes would be played, and the court had hearings on which tapes would be admitted. During the hearings, I understood that undercover tapes could not be introduced as substantive evidence if the trial witnesses admitted making the recorded statements during cross-examination. I therefore cross-examined the witnesses on the substance of the recorded statements, and used transcripts to refresh their memory. I was able to elicit statements which were favorable to Mr. Mina, and thus did not seek to introduce the tapes themselves as they would have been cumulative and inadmissible. The testimony elicited during trial allowed me to point out, in closing argument, that some of the others in the conspiracy had not received money from Mr. Mina, shared money with him, or otherwise shared information about which bars had been making payments to investigators.

<u>The theory that the agent's notes were "fabricated"</u>

15.  In January 2002, Mr. Mina made oral statements to Detective Kathleen Campbell and FBI agent Miles Yamane (collectively "the police") concerning their investigation into corruption at the Liquor Commission. According to the police, Mr. Mina confessed to being involved in a conspiracy with other

investigators to solicit and accept bribes from liquor licensees, which were primarily hostess and strip bars. In his statement, Mr. Mina admitted accepting several thousand dollars from bars over a period of approximately two years. Mr. Mina's statement was not recorded. A week after making the statement, Mr. Mina left for the Philippines. Mr. Mina was indicted in May 2002, and he was arrested in November 2002 in the Philippines and returned to Hawaii.

      16.  During discovery in the criminal case, I received a typewritten FBI report of Mr. Mina's interview. In conversations with me, Mr. Mina maintained that he had not admitted being involved in the conspiracy, and that he had been coerced by the police into making oral statements. I filed a motion to suppress Mr. Mina's oral statements, arguing that they were the product of custodial interrogation without a valid waiver of rights, and were involuntarily made. Prior to the hearing on the motion, and at my request, the government produced excerpts of Detective Campbell's handwritten notes of the interrogation which were relevant to issues raised by my motion. At the hearing, the court heard testimony from the police and Mr. Mina, found the police's version of events more credible, and denied the motion.

17. During the suppression hearing, Detective Campbell testified that she took notes during the questioning. Mr. Mina thereafter advised me that Detective Campbell's notes were "fabricated," and asked me to obtain full copies of the notes so he could review them for inconsistencies and prove they were fake. I filed a motion to compel production of the notes, which the government vigorously contested. The court held a hearing and ordered the notes produced. After reviewing the notes, Mr. Mina asked me to obtain the originals so that an expert could "age" the notes, <u>i.e.</u> determine when they were written. Mr. Mina contended that the notes were prepared in response to my motion to suppress, which was filed more than a year after the date of the interrogation.

18. I had been engaged in a criminal defense practice for almost fifteen years when Mr. Mina made his claim. During that time, I had never heard of police fabricating notes of a suspect interrogation, and I believed that the likelihood that the police would do so in this case was extreme to non-existent. I also checked with experienced criminal defense attorneys to see if they had ever heard of the police doing such a thing, or if they had any reason to believe that the particular individuals involved in this case would do so. None of the attorneys had

heard of such a practice, or had anything negative to report about the officers involved.

    19. I tried to dissuade Mr. Mina from taking such an extreme and incredible position in the case, but he insisted that I pursue the matter. Against my advice, Mr. Mina chose to testify at the hearing on the motion to compel copies of the notes. Mr. Mina testified that the police had coerced him into making statements, that the notes were a fake, and that he was willing to take a "lie detector" to prove his claims.

    20. At Mr. Mina's request, I investigated his theory that the notes were fake. On January 5, 2004, I spoke with the Technical Advisory Service for Attorneys (TASA), a consulting firm, about having the notes examined. A true and correct copy of a January 7, 2004 letter of confirmation which I received from TASA is attached as Exhibit "B." TASA advised me to speak with Dr. Albert H. Lyter, III of Federal Forensic Associates, www.inkdating.com, concerning the request. On January 6, 2004, I spoke with Dr. Lyter, and he advised me that his firm might be able to examine the notes and determine their age. On January 6, 2004, following this conversation, I lodged an ex parte motion with the court, seeking authority to incur $4,920 in Criminal Justice Act (CJA) funds under 18 U.S.C. § 3006A to retain Dr.

Lyter.  A true and correct copy of the motion which I lodged is attached as Exhibit "C."

    21.  On December 23, 2003, while I was seeking to obtain an ink dating expert, the government sent me a letter offering Mr. Mina the opportunity to submit to a polygraph examination administered by the FBI.  A true and correct copy of the letter is attached as Exhibit "D."  The polygraph examination was to cover various areas, including whether Mr. Mina was coerced into making statements, whether Detective Campbell had taken notes during his interview, and whether Mr. Mina had taken money from bar owners in return for overlooking liquor violations.  Instead of responding immediately to the government, I obtained court funds for the administration of a polygraph examination to Mr. Mina by a defense retained polygrapher.  I wanted to determine whether Mr. Mina could pass a polygraph examination before agreeing to the same by a government polygrapher.

    22.  On January 15, 2004, I requested permission to have Michael Patrick Orian, of Orian's Polygraph Investigative Service, conduct a polygraph examination of Mr. Mina at the Federal Detention Center on January 26, 2004.  A true and correct copy of my letter to counsel for the FDC is attached as Exhibit "E."  During the examination, Mr. Mina was to be asked whether the police took notes during the interrogation.

11

23.  While these arrangements were being made, I submitted the ex parte motion to the court requesting funds to date the age of ink contained on the original notes.  Mr. Mina was advised, and agreed, that the question concerning the taking of notes would be included in the defense polygraph examination, and that I could withdraw the ex parte motion if he did not pass the question.  Mr. Mina insisted that he would pass the question, as well as others, because the police were lying about the interrogation.

24.  Orian called me shortly after administering the polygraph examination to Mr. Mina.  Orian advised that Mr. Mina had failed all of the questions concerning whether he was coerced into making a confession, as well as the question of whether the police took notes during the interrogation.  During the examination, Orian asked Mr. Mina whether he had seen Detective Campbell taking notes during the interview.  Mr. Mina responded negatively.  According to Orian, Mr. Mina's response caused him to "hit" on all three of the charts of the polygraph, which caused Orian to find that Mr. Mina had been deceptive.

25.  Based on Orian's verbal report, I told him no written report of the polygraph examination was required.  I also advised the government that Mr. Mina would not undergo a polygraph examination administered by the FBI.  See January 29, 2004 letter

from then-AUSAs J. Michael Seabright and Craig H. Nakamura, attached as Exhibit "F," and my February 2, 2004 letter to AUSA Seabright, attached as Exhibit "G."  In accordance with my earlier agreement with Mr. Mina, I also called Magistrate Judge Kevin Chang's clerk and advised her I was withdrawing the ex parte motion to incur funds for the ink dating expert.  I withdrew the request because I felt it inappropriate to ask the court to expend $5,000 for the expert when Mr. Mina could not pass a simple polygraph examination by one of the most pro-defense polygraphers to establish that his version of events was true.  Based on my own experience, and conversations with other members of the defense bar, I also felt Mr. Mina's claims were desperate and incredible.

    26.  While preparing for trial, Mr. Mina asked me about the ex parte motion, and I advised him that it had been withdrawn pursuant to our agreement.  Mr. Mina said nothing at the time, but later sent me a March 7, 2004 letter accusing me of trying to protect the police.  By letter dated March 11, 2004, I responded to Mr. Mina, reiterating the reasons why I decided not to pursue a forensic examination of Detective Campbell's notes of the interrogation.  I pointed out that I had no desire to protect the police, but withdrew the motion based on Mr. Mina's failure to

13

pass a polygraph examination administered by a polygrapher of our choice.

27. Mr. Mina sent me further correspondence continuing to accuse me of protecting the police, and questioning whether I had even filed the ex parte motion for the ink dating expert. On or about March 24, 2004, as a result of Mr. Mina's complaints, I filed a second ex parte motion seeking authorization to incur CJA funds for an ink dating expert. The court lodged the document pending a decision by the magistrate judge. On March 24, 2004, Magistrate Judge Barry Kurren denied the motion, and both the motion and order denying the motion were filed.

28. Mr. Mina is correct that I filed the second ex parte motion to "appease" him. I did not, however, "railroad" the motion into being denied, or otherwise deceive Mr. Mina. The reason the motion and order reflect the same filing date is that when the court denies ex parte motions for CJA funds, it typically files the motion and order at the same time.

Office of Disciplinary Counsel proceedings

29. On August 16, 2004, after the trial, Mr. Mina filed a complaint against me with the State of Hawaii, Office of the Disciplinary Counsel, asserting many of the same claims which he raises in this 28 U.S.C. § 2255 motion. I provided information in response to the complaint. By letter dated December 8, 2004,

the Office of Disciplinary Counsel dismissed the complaint. A true and correct copy of its letter is attached hereto as Exhibit "H."

      I declare under penalty of perjury that the foregoing is true and correct.

      DATED:   Honolulu, Hawaii,_____April 30, 2007_____.


                                     _/s/ Clifford B. Hunt_____
                                     CLIFFORD B. HUNT